MILBANK LLP
Linda Dakin-Grimm (SBN 119630)
Ldakin-grimm@milbank.com
Asena Baran (SBN 342626)
Abaran@milbank.com
Lya Ferreyra (SBN 340148)
Lferreyra@milbank.com
2029 Century Park East, 33rd Floor
Los Angeles, CA 90067
Telephone: 424-386-4000
Facsimile: 213-629-5063

*Pro Bono* Attorneys for Plaintiff,
Esvin Fernando Arredondo Rodriguez

## UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA
## WESTERN DIVISION

| | |
|---|---|
| Esvin Fernando Arredondo Rodriguez, | ) ) ) |
| Plaintiff, | ) ) |
| v. | ) ) |
| United States of America, | ) ) |
| Defendant. | ) ) |

Civil Action No.  2:22-CV-02845

**COMPLAINT FOR DAMAGES**

**COMPLAINT**

Plaintiff Esvin Fernando Arredondo Rodriguez ("Mr. Arredondo Rodriguez") brings this complaint on behalf of himself and his minor daughter Andrea Fernanda Arredondo Jerez ("Andrea") against the United States of America pursuant to the Federal Tort Claims Act ("FTCA"), 28 U.S.C. § 1346(b) and §§ 2671–2680.

**INTRODUCTION**

1.      This complaint seeks to hold the United States government accountable for its willful, unlawful, cruel, and inhumane treatment of Mr. Arredondo Rodriguez and his then-twelve-year-old child, Andrea, following their lawful approach to an official border crossing to request asylum.  Instead of responding to the Arredondos in the manner required by law, officials of the United States government forcibly separated Andrea and her father and subjected them – without reason or justification – to incarceration and tactics which amounted to torture.  The U.S. government willfully inflicted severe pain and suffering on both Arredondos as part of the government's official "Zero Tolerance" deterrence policy aimed at discouraging migrants from lawfully requesting asylum in the United States.

2.      The United States' treatment of Mr. Arredondo Rodriguez and Andrea was intentional and wantonly cruel.  The Zero Tolerance policy of family separation was announced in 2018 but had first been implemented in 2017.  This policy had one goal: to deter migrants from coming to the southern border of the United States to seek asylum, for fear that their children would be taken from them.  As then-acting assistant secretary of Health and Human Services, Steven Wagner confirmed at the time, the government "expect[ed] that the new [separation] policy [would] result in a deterrence effect… [and] stop [immigrant families from] entering the country."[1]  Former president Donald Trump publicly

---

[1] Philip Bump, *Here Are the Administration Officials who Have Said that Family Separation Is Meant as a Deterrent*, WASH. POST (June 19, 2018),

announced the deterrence motive of the policy, tweeting "if you don't separate, FAR more people will come."[2]

3.       The government separated at least 4,200 children like Andrea from their parents under the family separation policy.[3]  This number does not include families that may not have been counted before District Judge Dana M. Sabraw of the U.S. District Court for the Southern District of California entered orders in the case called *Ms. L., et al. v. U.S. Immigration and Customs Enforcement ("ICE") et al.*, Case No. 18cv0428 DMS (MDD) enjoining the government from enforcing the policy, and requiring the government formally to account for and reunite the separated families.[4]

4.       By separating children like Andrea from their parents, the government intended to inflict severe harm including psychological torture on them, in the hope that this would deter others from seeking asylum.  The government repeatedly admitted and explicitly stated its intent to traumatize families like the Arredondos, with the expectation that by doing so, other families would be too terrified to come to the border.  Former Secretary of the U.S. Department of Homeland Security and then-Chief of Staff to the President, General John Kelly, best displayed the government's indifference to immigrant children stolen from their parents when he stated that "a big name of the game is deterrence," and "it could be a tough deterrent – would be a tough deterrent."[5] Demonstrating utter indifference to the

---

https://www.washingtonpost.com/news/politics/wp/2018/06/19/here-are-the-administration-officials-who-have-said-that-family-separation-is-meant-as-a-deterrent/.

[2] Donald J. Trump (@realdonaldtrump), TWITTER (Dec. 16, 2018, 8:25 AM), https://twitter.com/realDonaldTrump/status/1074339834351759363.

[3] Leila Rafei, *Family Separation, Two Years After Ms. L*, ACLU, Feb. 26, 2020, https://www.aclu.org/news/immigrants-rights/family-separation-two-years-after-ms-l.

[4] *See* OFFICE OF INSPECTOR GEN., SEPARATED CHILDREN PLACED IN OFFICE OF REFUGEE RESETTLEMENT CARE 1, 6, 13 (Jan., 2019) (reporting that "thousands of children may have been separated . . . before the accounting required by the Court [in *Ms. L.*]"); *see also Family Separation: Two Years Later, The Crisis Continues*, KIDS IN NEED OF DEFENSE 4 (July 2020), https://supportkind.org/wp-content/uploads/2020/07/Family-Separation-Report-2020-FINAL-2.pdf.

[5] Bump, *supra* note 1.

suffering and long-term damage inflicted on the affected children, General Kelly mused that the children would be "put into foster care or whatever."[6] After Judge Sabraw enjoined the government from enforcing the Zero Tolerance policy, and its true extent and effects began to be known, a report by the Offices of Inspectors General (OIG) found that "DHS was not fully prepared to implement the Administration's Zero Tolerance Policy or to deal with some of its after-effects." [7]

5. Officials of the government willfully and wantonly inflicted immense pain and suffering on already desperate parents and children, particularly those from Central America, like Mr. Arredondo Rodriguez and Andrea. In fact, multiple government officials in addition to Mr. Trump and General Kelly stated publicly that the purpose of family separation was to deter Central American families from seeking asylum in the United States.[8] Mr. Arredondo Rodriguez, Andrea, and thousands of others suffered at the hands of these government officials.

6. In 2018, Mr. Arredondo Rodriguez, his wife, Cleivi Marilu Jerez Lara ("Mrs. Jerez Lara"), and their three daughters, Keyli Yetsari Arredondo Jerez ("Keyli"), Andrea Fernanda Arredondo Jerez ("Andrea") and Alison Samanta Arredondo Jerez ("Alison") fled Guatemala to seek asylum in the United States. The family was forced to leave their home in Guatemala due to persistent threats against their lives related to perceived political opinion activity, following the brutal murder of then-seventeen-year-old son and brother, Marco. The family was

---

[6] *Transcript: White House Chief of Staff John Kelly's Interview With NPR*, NPR (May 11, 2018), https://www.npr.org/2018/05/11/610116389/transcript-white-house-chief-of-staff-john-kellys-interview-with-npr. (emphasis added).

[7] RICHARD J. DURBIN ET. AL., Letter to President Joseph R. Biden, Jr. (Mar. 16, 2022) https://www.warren.senate.gov/imo/media/doc/Senate%20Letter%20to%20President%20Biden%20-%20March%2016,%202022.pdf. (internal quotations omitted).

[8] *See* David Shepardson, *Trump Says Family Separations Deter Illegal Immigration*, REUTERS (Oct. 13, 2018, 5:44 PM), https://www.reuters.com/article/us-usa-immigration-trump/trump-says-family-separations-deter-illegal-immigration-idUSKCN1MO00C.; *see also Sessions Admits Policy Is a Deterrent*, CNN (June 19, 2018), https://www.cnn.com/videos/politics/2018/06/19/sessions-defends-controversial-immigration-policy-deterrent-sot.cnn.

1  threatened by persons acting on behalf of the police, government, and local gangs
2  with whom those entities regularly engaged.

3     7.    The Mexican government separated Mr. Arredondo Rodriguez and
4  Andrea from Mrs. Jerez Lara, Keyli and Alison, while the family was traveling on
5  a bus. As a result, Mrs. Jerez Lara and the two girls arrived at Laredo, Texas on
6  May 12, 2018 (without Mr. Arredondo Rodriguez and Andrea) and requested
7  asylum at the official Laredo border crossing. Mrs. Jerez Lara was given a credible
8  fear interview on May 24, 2018, which she passed. After briefly residing at the
9  Dilley family residential facility, mother and two daughters were given a Notice to
10  Appear in immigration court and allowed to travel to Los Angeles, California to
11  stay with a relative while they went through immigration proceedings.

12     8.    A few days after Mrs. Jerez Lara and two of her daughters arrived at
13  the official Laredo border crossing, Mr. Arredondo Rodriguez and Andrea arrived
14  at the same border crossing on May 16, 2018, to ask for asylum. (All family
15  members approached the official Laredo border crossing facility to request asylum;
16  none of them crossed into the United States unlawfully.) When Mr. Arredondo
17  Rodriguez and Andrea walked up to the official Laredo border crossing to seek
18  asylum in the manner allowed under U.S. law, they were treated very differently
19  than Mrs. Jerez Lara, Keyli and Alison had been. Government agents grabbed and
20  forcibly separated Andrea from her father, manhandling her away from him as she
21  sobbed. Neither Andrea nor her father were told what was happening, why Andrea
22  was being taken, where she would be taken or when they might see each other
23  again. Mr. Arredondo Rodriguez was subsequently imprisoned in cruel and
24  inhumane conditions in a series of federally contracted facilities in Texas and
25  Georgia, without ever being told of any charges against him. Though she had
26  asked for asylum at the border crossing with her father, Andrea was declared to be
27  an "unaccompanied minor" and was sent to an Office of Refugee Resettlement-
28  contracted facility in Texas for children who came to the border by themselves.

1   Government officials denied Mr. Arredondo Rodriguez access to the asylum

2   process, lied to him about his rights, tricked him, and ultimately deported him in

3   direct violation of orders that had been entered by Judge Sabraw in the *Ms. L. case*

4   enjoining the deportation of parents whose children had been taken from them.

5       9.       After his deportation, Mr. Arredondo Rodriguez lived in fear and in

6   hiding in Guatemala, moving from place to place.  After weeks in custody, and

7   without ever speaking with her father again, Andrea was eventually released into

8   the custody of her mother in Los Angeles, California.

9       10.      After vigorously contested and extensive proceedings in the *Ms. L.*

10  case, Judge Sabraw ultimately found, on September 4, 2019, Case No: 3:18-cv-

11  00428-DMS-MDD, (ECF at 456, p. 13, lines 13-19) that the United States had

12  unlawfully deported Mr. Arredondo Rodriguez.  Before entering this Order (the

13  "September 4, 2019 Order"), Judge Sabraw had ordered the government to produce

14  *the entire immigration record* on which Mr. Arredondo's deportation had been

15  based, in order to fully develop the record. Case No: 3:18-cv-00428-DMS-MDD,

16  (ECF No. 437, ECF No. 456 at, 9).  The government failed to produce any

17  documents concerning Mr. Arredondo Rodriguez that would have shown that it

18  complied with the law by, for example, providing him with access to counsel,

19  documents in his native language, notice of any charges against him, or a credible

20  fear interview.  In contrast, Mr. Arredondo's sworn declarations established that

21  the government ignored U.S. law, lied to him about his rights and situation and

22  deported him without any legal basis, notwithstanding Judge Sabraw's injunction

23  against such deportation.

24      11.      Notwithstanding Judge Sabraw's September 4, 2019 Order, the

25  government *still* did not allow Mr. Arredondo Rodriguez to return to the U.S. to be

26  reunited with Andrea and to seek asylum with his family *for more than four*

27  *months*.  Mr. Arredondo Rodriguez lived every day of this four-month period in

28  despair and danger.  Finally, after another emergency motion before Judge Sabraw

to enforce the September 4, 2019 Order, U.S. Immigration and Customs Enforcement ("ICE") sent Mr. Arredondo Rodriguez's counsel a letter dated January 17, 2020 (the January 17, 2020 ICE Letter).  Instead of acknowledging that a federal court had ordered Mr. Arredondo's return, the letter stated that Mr. Arredondo was being offered "humanitarian parole" for a period of three days. The January 17, 2020 ICE Letter directed Mr. Arredondo Rodriguez to present the letter at the U.S. Embassy in Guatemala City to obtain travel documents to enter the United States.  When Mr. Arredondo Rodriguez and his counsel presented the January 17, 2020, ICE letter at the U.S. Embassy on January 21, 2020, however, they were refused entrance to the Embassy and directed to leave while armed Guatemalan police stood by.  Only after telephonic intervention by Congressional officials, were Mr. Arredondo Rodriguez and his counsel directed to go to an ICE facility elsewhere in Guatemala City, where they were provided two sealed envelopes to present (1) to Guatemalan airport officials and (2) to U.S. Customs and Border Protection officials when traveling to the United States the next day.

12.	Throughout this experience, Mr. Arredondo Rodriguez was terrified that at any moment he could again be grabbed and incarcerated or that United States officials were tricking and/or lying to him about whether he would be allowed to reunite with his daughter and family.  Mr. Arredondo Rodriguez lawfully re-entered the country on January 22, 2020, flying into Los Angeles, California, accompanied by his lawyer, a Catholic priest, and a rabbi, who were there to provide emotional and spiritual support.

13.	The reunification of the Arredondo-Jerez family did not abate the harm caused by the United States government.  The trauma inflicted on Mr. Arredondo Rodriguez and Andrea caused both to suffer severe emotional distress and has resulted in diagnoses that include post-traumatic stress disorder. Both Mr. Arredondo Rodriguez and Andrea suffer ongoing psychological distress including depression, obsessive anxiety, and trauma of an extreme nature.  While

incarcerated without cause at for-profit prisons in Texas and Georgia, Mr. Arredondo Rodriguez's distress included suicidal ideation and debilitating physical symptoms including rapid weight loss, severe hair loss, chronic headaches, abdominal pain, and urinary tract pain.  In all, the government's policy succeeded in its objective—the United States severely traumatized Mr. Arredondo Rodriguez and his child causing effects which will continue throughout their lives.

14.     Mr. Arredondo Rodriguez and Andrea's separation, imprisonment, wrongful deportation, and mistreatment at the hands of United States government officials and their contracted agents has irrevocably debilitated their physical, emotional, and psychological wellbeing.  The United States is thus liable under the FTCA for all the conduct that harmed Mr. Arredondo Rodriguez and Andrea.

## JURISDICTION AND VENUE

15.     This Court has jurisdiction over Mr. Arredondo Rodriguez's and Andrea's claims for money damages against the United States pursuant to 28 U.S.C. § 1346(b)(1).

16.     Mr. Arredondo Rodriguez has exhausted his and Andrea's FTCA administrative claims.  On February 7, 2020, Mr. Arredondo Rodriguez's served the relevant United States departments and agencies with all required administrative forms for his and Andrea's claims by priority overnight mail.  The government acknowledged receipt of these claims in writing by letter dated May 11, 2020, from James G. Touhey, Jr., of the U.S. Department of Justice, Federal Tort Claims Act Staff, but provided no final disposition of the administrative claims over the six months thereafter and has since failed to address them. Mr. Arredondo Rodriguez therefore exercises the option to deem his own and Andrea's claims denied pursuant to 28 U.S.C. § 2675(a).

17.     Mr. Arredondo Rodriguez and Andrea reside in Los Angeles, California, which is within the Central District of California.  Venue is therefore appropriate under 28 U.S.C. § 1402(b).

## PARTIES

18.    Plaintiff Esvin Fernando Arredondo Rodriguez is a now 47-year-old Guatemalan man, who at age 43, was separated from his then-12-year-old daughter, Andrea Fernanda Arredondo Jerez, by officials of the United States government on May 16, 2018.  The separation continued for twenty months, until they were finally reunited on January 22, 2020.

19.    Defendant United States of America is the proper defendant under the FTCA.  28 U.S.C. §§ 1346(b), 2674.  Mr. Arredondo Rodriguez is seeking damages from the United States for his and his daughter's personal injuries caused by the wrongful acts or omissions of its employees, including employees of the Department of Homeland Security (DHS), Customs and Border Protection (CBP), United States Citizenship and Immigration Services (USCIS), Immigration and Customs Enforcement (ICE), as well as the Department of Health and Human Services (HHS).  See 28 U.S.C. § 2671.  Those employees of the United States were acting within the scope of their employment under circumstances where the United States, if a private person, would be liable to Mr. Arredondo Rodriguez and his daughter.  28 U.S.C. § 1346(b).

## ALLEGATIONS

### A.    The Government's Family-Separation Policy

20.    In 2017, former U.S. president Donald Trump and his administration began separating families along the United States' southern border with Mexico as part of a yet-to be announced "Zero-Tolerance" policy.  The policy was not publicly announced until April 2018.  Among other things, it mandated the prosecution of all persons that crossed the border between ports of entry.[9]  Of course, Mr. Arredondo Rodriguez and his daughter Andrea did not cross the border

---

[9] *Attorney General Announces Zero-Tolerance Policy for Criminal Illegal Entry*, DEP'T OF JUSTICE (Apr. 6, 2018), https://www.justice.gov/opa/pr/attorney-general-announces-zero-tolerance-policy-criminal-illegal-entry.

between ports of entry but sought asylum at an official border crossing. Nevertheless, the government officials applied the policy to them. The family-separation aspect of the policy, in which children were forcibly taken from parents, sought to discourage other families from seeking lawful asylum in the United States by imposing draconian and inhuman consequences upon those who sought asylum. Deterring immigration by traumatizing families and injuring parents and children was the policy's objective.

21. Trump administration officials knew that forcible separation would cause life-changing and irreparable trauma to parents and children. They simply did not care. The family-separation policy was designed to inflict so much pain and suffering that potential applicants for asylum – who had not yet come to the U.S. border – would not come, and those already detained in the United States would be so psychologically and physically disabled that they would be unable to navigate the opaque immigration system.

22. Judge Dana Sabraw, of the U.S. District Court for the Southern District of California, enjoined the family-separation policy after finding that plaintiffs would likely succeed on their claim that the separations were unconstitutional.[10] Undeterred, then-president Trump continued to promote the policy telling reporters that "[if] they feel there will be separation, they don't come."[11]

**B.    Mr. Arredondo Rodriguez and Andrea Come to the United States Seeking Asylum**

23. Mr. Arredondo Rodriguez, his wife and his three daughters were forced to leave Guatemala after Mr. Arredondo Rodriguez's seventeen-year-old son Marco was murdered and the rest of the family's lives were repeatedly threatened by Guatemalan police, government officials and gang members

---

[10] *Ms. L. v. U.S. Immigr. & Customs Enf't*, 310 F. Supp. 3d 1133, 1142–46, 1149 (S.D. Cal. 2018), modified, 330 F.R.D. 284 (S.D. Cal. 2019).

[11] Shepardson, *supra* note 8.

affiliated with them, because of Mr. Arredondo Rodriguez's perceived political activity.

24.    The family fled Guatemala together at the end of February 2018. Mexican authorities pulled Mr. Arredondo Rodriguez and Andrea off a bus on which the family was traveling, thus separating them from the rest of the family, before the group arrived at the U.S. border.  Accordingly, Mrs. Jerez Lara and daughters Keyli and Alison arrived at the border and sought asylum at the official border crossing several days before Mr. Arredondo Rodriguez and Andrea arrived.

25.    On May 16, 2018, Mr. Arredondo Rodriguez and Andrea arrived at the Nuevo Laredo official border crossing.  They walked up to the official crossing point and asked for asylum in the manner allowed under U.S. law.

**C.    Government Agents Separate Mr. Arredondo Rodriguez and Andrea**

26.    After presenting themselves to immigration officials at Nuevo Laredo, Mr. Arredondo Rodriguez and Andrea were immediately detained in a cold room at the station with about twenty-five other adults and children.  They were left in this room for eight to nine hours.

27.    The adults, including Mr. Arredondo Rodriguez, were told to fill out forms for their children first and next themselves.  As Mr. Arredondo Rodriguez filled out his and Andrea's forms, an immigration officer grabbed one of Andrea's arms and pulled her away from her father.  Without responding to Mr. Arredondo Rodriguez's cries for an explanation as to why his child was being treated so aggressively, the officer announced that he was taking Andrea to an area with other children.

28.    Andrea, who is usually a stoic child, could not stop crying.  Shaking, she screamed that she did not want to be taken from her father.  She grabbed her father and would not let go.  Mr. Arredondo Rodriguez begged the officer to let Andrea stay as she was only twelve years old.  He pleaded with the officer, asking

for some explanation about where he was taking Andrea.  The officer said only that more information might be available later.  Too scared and panicked to say anything to the officer, Andrea could only look at Mr. Arredondo Rodriguez, with tears streaming down her face as she was taken away.

29.   Powerless to help his child, Mr. Arredondo Rodriguez felt shame and despair.  He had no recourse against the aggressive, uniformed officer.  Still, he felt he had failed his daughter.  Having to let the officer take his Andrea agonized him.  As he helplessly watched Andrea get dragged away, Mr. Arredondo Rodriguez felt panic at the thought that the officer would harm his daughter and that he would never see her again.

### D.   Government Agents Harm Mr. Arredondo Rodriguez

30.   Mr. Arredondo Rodriguez remained with other distraught parents who had also had their children taken away.  Mr. Arredondo Rodriguez begged the officers who occasionally patrolled the halls to tell him what they had done with Andrea, but the officers did not respond.

31.   At about 3:00 a.m., officers lined up the detained children outside of the adult holding cell in direct view from a window of their panicked parents. Having seen their children lined up like prisoners, the parents pounded on the door, screaming for information about the fate of their children.  None of the officers responded.  The officers marched the children out of sight.

32.   The room in which the adults remained was cold and cramped. Mr. Arredondo Rodriguez was only given a Mylar sheet for warmth.  There were no seats or beds.  The officers distributed food and a small bottle of water twice in the time Mr. Arredondo Rodriguez was confined there.  The parents continued to plead for information about their children to the officer who brought them food. The officer provided no information.  Approximately sixteen hours later, the parents were moved to formal detention centers.

33.     ICE moved Mr. Arredondo Rodriguez to the Rio Grande Detention Center near Laredo Texas the next day.  The Rio Grande Detention Center is a privately owned, for-profit facility operated by the GEO Group under contract to ICE.  Mr. Arredondo Rodriguez asked if Andrea would be waiting there for him. The officers simply said no.  To make the transfer to the Rio Grande Detention Center, ICE officers handcuffed Mr. Arredondo Rodriguez behind his back and placed him in leg chains.  Short chains connected cuffs on his hands and feet, pulling his arms to his feet with each step.  Mr. Arredondo Rodriguez, a law-abiding man with no criminal history, who had not been apprised of any wrongdoing, felt deeply ashamed.  He did not understand why he was being treated like a criminal.

34.     When Mr. Arredondo Rodriguez arrived at Rio Grande Detention Center, he was taken into a cell.  Officers still refused to give him any information about Andrea.  Nor did they explain why he was being imprisoned, or for how long.  Eventually, Mr. Arredondo Rodriguez learned that Andrea was in a detention center for minors in San Antonio, Texas.  He was not allowed to contact her, and he was not allowed to receive phone calls.  Mr. Arredondo Rodriguez was held in the Rio Grande Detention Center for two-and-a-half weeks.

35.     Without notice or explanation, ICE next moved Mr. Arredondo Rodriguez to Stewart Detention Center, more than 1000 miles away, in Georgia. Stewart is another for-profit prison operated by CoreCivic, under contract to ICE. During the long trip to Georgia, ICE again cuffed, and placed Mr. Arredondo Rodriguez in leg chains for up to twelve hours at a time.

36.     At Stewart, Mr. Arredondo Rodriguez became ill.  He lost his appetite and was too sick to go out into the yard.  He did not have access to bare necessities like toothpaste, which the prison sold for $11 a tube.  He did not know the other prisoners or the reasons for their imprisonment.  Not knowing who to trust, he

1   suffered in isolation.  He lay awake at night fighting off nightmares of his family
2   being stripped away from him, one-by-one.

3         37.    While at Stewart, Mr. Arredondo Rodriguez developed severe and
4   frequent headaches, mostly behind his left eye.  He suffered a high fever.  In his
5   cell at Stewart, Mr. Arredondo Rodriguez tried to fight off the chills and body
6   aches in debilitating pain.  His hair began to fall out, and he broke out in hives.
7   His stomach ached, and he developed symptoms of a urinary tract infection.  He
8   lost eight pounds during the first two weeks he was incarcerated at Stewart.  Prison
9   officials ignored or failed to notice his condition.  No medical care was offered.

10         38.    Mr. Arredondo Rodriguez's mental health significantly declined.  He
11   was desperate to know what had happened to his family.  Consumed by fear and
12   sadness, he became anxious and irritable.  He could not fight off intrusive thoughts
13   of his family being harmed.  Unable to help his family or himself, Mr. Arredondo
14   Rodriguez fell into a deep depression.

15         39.    After two weeks at Stewart, ICE once again inexplicably transferred
16   Mr. Arredondo Rodriguez to another facility – Folkston Immigration Processing
17   Center in Georgia.  Folkston is another for-profit prison operated by GEO Group,
18   under contract with ICE. For the entirety of the two-hundred-mile trip between
19   Stewart and Folkston, ICE cuffed Mr. Arredondo Rodriguez and placed him in leg
20   chains.  After another ten disorienting days at Folkston, Mr. Arredondo Rodriguez
21   was again transferred in chains *back to Stewart*, where he was imprisoned for
22   another month and a half.

23         40.    At both Georgia detention centers Mr. Arredondo Rodriguez was
24   afraid he would be punished if he affirmatively requested to see a doctor or nurse.
25   He observed that those who complained or asked for help ended up in a locked
26   isolation.  Mr. Arredondo Rodriguez heard that some men were kept in isolation
27   for long periods of time.  Prison officers did nothing to dispel the rumors about the
28   consequences of seeking medical care.  Mr. Arredondo Rodriguez was never

offered medical care even though he clearly required medical attention.  No staff ever asked about Mr. Arredondo Rodriguez's health or his obviously deteriorating condition.

41.     As he battled illness, Mr. Arredondo Rodriguez could not escape the thoughts that he would never see his family again or that they had come to great harm.  He was consumed by terror.  He prayed to fight off his suicidal ideations.

42.     At Folkston, Mr. Arredondo Rodriguez was directed to speak with a woman he was told was an ICE representative on the phone.  He was not given the woman's name.  He could not understand her questions, but the woman refused to repeat them.  Eight days after that phone call, an unidentified ICE officer told Mr. Arredondo Rodriguez that he had failed a "credible fear interview," and that ICE had determined he did not qualify for asylum.  The ICE officer told Mr. Arredondo that it would be a waste of time for him to ask for an immigration judge to review ICE's decision because American immigration judges always defer to ICE's decisions.  The ICE agent said the U.S. is "not interested in accepting people like Mr. Arredondo Rodriguez."  The ICE agent told Mr. Arredondo Rodriguez to sign a paper that was written in English without a translation.  The officer told Mr. Arredondo Rodriguez that unless he signed, he would stay in detention indefinitely.[12] The ICE agent adamantly stated that "people like [Mr. Arredondo Rodriguez]" can never get asylum in this country.  The ICE officer did not give Mr. Arredondo Rodriguez any papers memorializing his name or the statements he made to Mr. Arredondo Rodriguez.

---

[12] In *Ms. L*, Judge Sabraw ordered the government to produce all records on which it had relied in deporting Mr. Arredondo Rodriguez. *Ms. L. v. U.S. Immigr. & Customs Enf't*, No. 18-cv-00428, ECF No. 437, 3 (S.D. Cal. July 29, 2019). The government did not produce a single document suggesting Mr. Arredondo Rodriguez was ever given a credible fear interview. Nor did the government produce the paper Mr. Arredondo Rodriguez was tricked into signing. It is unknown which agency personnel organized the phone conversation, or what its purpose was. There is no evidence that Mr. Arredondo Rodriguez was given a bona fide credible fear interview before he was deported.

43.     The U.S. government deported Mr. Arredondo Rodriguez to Guatemala on August 22, 2018, in direct violation of Judge Sabraw's orders. Mr. Arredondo Rodriguez was terrified he would be killed after he was returned to Guatemala.  In Guatemala, he lived in a state of perpetual terror.  He hid, moving around from place to place to avoid detection by those who had murdered his son and threatened the lives of his family.

**E.     Government Agents Harm Andrea**

44.     After being dragged away from her father at the border station, Andrea was placed in a different room crowded with children.  Some children were crying, and others stood in silence.  In the middle of the night, government officers ordered the children to line up outside.  The stunned and disoriented Andrea followed the officers' orders.  She believed she would never see her father again, and she had no hope that she would ever be able to find her mother and sisters. She was unaware that her father had watched the children line up outside.

45.     Andrea was taken to Baptist Child and Family Services in San Antonio Texas, a subcontracted Office of Refugee Resettlement ("ORR") facility for unaccompanied minors.  Unlike Andrea, the children at this facility had chosen to come to the U.S. without their parents.  Andrea arrived at the shelter crying uncontrollably.  The officials refused her request to contact her parents.  Andrea was held in ORR custody for about a month, not knowing where her father was or when she would ever see her family.  Andrea feared that she would be kept at the shelter until she turned eighteen.

46.     Eventually, Andrea was released to the custody of her mother in Los Angeles, California.  Her hopes of seeing her father again were dashed when she learned he had been deported.

47.     Andrea's mental health deteriorated, having lost her father after the horrendous ordeal at the border.  Andrea was haunted by the memories of her

ordeal at the border and her helplessness in detention. Andrea struggled to eat or sleep.

**F.    Mr. Arredondo Rodriguez Was Unlawfully Deported in Direct Violation of a Federal Court Order**

48.    On June 26, 2018, Judge Dana Sabraw granted a nationwide injunction against the Trump Administration's family separation policy. *Ms. L. v. U.S. Immigr. & Customs Enf't*, 310 F.Supp.3d 1133 (S.D. Cal. 2018).  Judge Sabraw's order not only enjoined the family-separations at the border but also forbade the government from deporting parents (like Mr. Arredondo Rodriguez) whose children had been taken from them.

49.    On June 26, 2018, Mr. Arredondo Rodriguez was ill and languishing in the Stewart Detention Center in Georgia.  Two months *after* Judge Sabraw's injunction, rather than reuniting him with Andrea, the government deported him to Guatemala.

50.    Three months later, Judge Sabraw entered a third order, approving an agreement between the government and the ACLU (the "*Ms. L* Settlement Agreement") that was, among other things, intended to give an opportunity to *some* deported parents like Mr. Arredondo Rodriguez the opportunity to return to the U.S. to apply for asylum with their children.

51.    In March 2019, Judge Sabraw ordered the government to identify and reunite all separated families that had been in U.S. custody on June 26, 2018, whether or not members of the family had been deported.[13]  In response, the government simply omitted Mr. Arredondo Rodriguez and Andrea from its identification of separated families.  Accordingly, the government refused even to consider Mr. Arredondo Rodriguez for potential return to the U.S. under the provisions of the *Ms. L* Settlement Agreement.  After another motion before Judge

---

[13] Julie Small, *Judge: Immigration Must Account for Thousands More Migrant Kids Split Up from Parents*, NPR, (March 19, 2019), https://www.npr.org/2019/03/09/701935587/judge-immigration-must-identify-thousands-more-migrant-kids-separated-from-paren.

Sabraw, which was heavily contested by the government, Judge Sabraw ordered the government to count Mr. Arredondo Rodriguez and Andrea in a new identification of separated families. *Ms. L. v. U.S. Immigr. & Customs Enf't*, 3:18-cv-00428-DMS-MDD, (ECF No. 386 at, 13-14) (S.D. Cal. Mar. 8, 2019).

52.    Once the government was forced to concede that it had separated Mr. Arredondo and Andrea and that Mr. Arredondo Rodriguez was entitled to be considered for return under the *Ms. L.* Settlement Agreement, Mr. Arredondo Rodriguez applied to be considered.  He provided sworn declarations concerning what he had experienced. The government rejected his application and that of every other deported parent who asked to return under the provisions of the *Ms. L.* Settlement Agreement.

53.    Mr. Arredondo Rodriguez next applied for humanitarian parole at the suggestion of one of the government's lawyers in the *Ms. L* case. Mr. Arredondo Rodriguez provided sworn testimony and letters of support for his application from the Roman Catholic Archdiocese of Los Angeles and Temple Israel of Hollywood. The government summarily denied Mr. Arredondo Rodriguez's humanitarian parole application, and the applications of every separated and deported parent who similarly applied, without explanation.

54.    Mr. Arredondo Rodriguez was part of a group of separated and deported parents on whose behalf the ACLU, the plaintiff in the *Ms. L.* case, sought relief from Judge Sabraw, based on the government's bad faith refusal to comply with the provisions of the *Ms. L* Settlement Agreement.  On September 4, 2019, after several rounds of briefing and oral argument and after having ordered the government to produce all evidence on which it had based the deportations of the parents in question (including Mr. Arredondo Rodriguez), Judge Sabraw ruled that the government's deportation of Mr. Arredondo Rodriguez in the summer of 2018 was unlawful.  Judge Sabraw ordered the government to facilitate his return to be reunited with Andrea to pursue his asylum claim.

55.     On January 22, 2020, Mr. Arredondo Rodriguez was finally allowed to return to the U.S. on a commercial flight—to be reunited with his children and to pursue asylum with his family.  When he returned, Mr. Arredondo Rodriguez's wife, Cleivi Marilu Jerez Lara, and his daughters Keyli and Alison, had already filed asylum claims before an "immigration judge" at the Executive Office of Immigration Review ("EOIR").  EOIR is a sub-agency of the U.S. Department of Justice, and its "judges" are not independent federal judges, appointed by the president and confirmed by the Senate, with authority derived from Article III of the U.S. Constitution.  Rather, they are civil servants who administratively adjudicate matters under the supervision and at the direction of the Department of Justice.

56.     Although backlogs ordinarily would have meant a long wait before Mr. Arredondo Rodriguez received an initial date to appear in EOIR immigration court, ICE immediately docketed his case, and Mr. Arredondo Rodriguez's case was assigned to a *different* EOIR judge than the judge who had been presiding over the rest of the family's case – a judge who had never worked for ICE. Mr. Arredondo Rodriguez's case was assigned to Jason Waterloo, who is not a member of the California Bar, and who – from 2014 through July 2018, was Assistant Chief Counsel of the Principal Legal Advisor to ICE and the Department of Homeland Security.  These two entities (ICE and DHS) were the governmental agencies responsible for the wrongful conduct against Mr. Arredondo Rodriguez and his daughter Andrea that is addressed herein.  ICE and DHS were directly responsible for Mr. Arredondo Rodriguez's unlawful deportation in 2018, were defendants in the *Ms. L.* class action in which Judge Sabraw found their conduct to be unlawful, and were the agencies that vigorously resisted Mr. Arredondo Rodriguez's return to the U.S.  On motion by Judge Waterloo's former employer (the Office of Chief Counsel, ICE and DHS), the asylum cases of Mrs. Jerez Lara and the two girls were immediately re-assigned to Judge Waterloo as well.

Mr. Arredondo is deeply concerned about the appearance of bias and absence of impartiality in the consideration of his and his family's asylum claims.

57.     Mr. Arredondo Rodriguez's asylum claim (and that of the five members of the family) has been fully briefed since 2020.

58.     In 2022, the immigration case of the five members of Mr. Arredondo Rodriguez's family was assigned to a new immigration judge, Andrea Siebert, who was appointed as an EOIR judge in October 2021.  From 2012 to 2021, Ms. Siebert, who is not a member of the California Bar, worked as Assistant Chief Counsel of the Principal Legal Advisor to ICE and the Department of Homeland Security in Los Angeles, California.  These two entities (ICE and DHS) were the governmental agencies responsible for the wrongful conduct against Mr. Arredondo Rodriguez and his daughter Andrea that is addressed herein.  ICE and DHS were directly responsible for Mr. Arredondo Rodriguez's unlawful deportation in 2018, were defendants in the *Ms. L.* class action in which Judge Sabraw found their conduct to be unlawful and were the agencies that vigorously resisted Mr. Arredondo Rodriguez's return.  Mr. Arredondo remains deeply concerned about the appearance of bias and absence of impartiality in the consideration of his and his family's asylum claims.  He also fears retaliation as a result of his lawful pursuit of this case under the Federal Tort Claims Act.

**G      The Separation of Mr. Arredondo Rodriguez from Andrea Was Unlawful and Unconstitutional**

59.     As the decisions in *Ms. L.* confirmed, those who were subjected to the family-separation policy were "victims of a wide-spread government practice" implemented by ICE, DHS and Customs and Border Protection for "no legitimate reason."  *Ms. L. v. U.S. Immigr. & Customs Enf't*, 302 F. Supp. 3d 1149, 1165 (S.D. Cal. 2018).  In fact, by separating Mr. Arredondo Rodriguez from Andrea, federal officers from these agencies not only breached their duty to immigrant families but also violated their fundamental constitutional and human rights.

20

60.     Despite the family-separation policy's implication, federal officers have a duty to immigrant families.  *See* U.S. Const. Amend. V; The Refugee Act, Pub. L. No. 96-212, 94 Stat. 102 (1980) (codifying these duties).  First, they have a duty not to separate immigrant families that are arrested together.  *Ms. L.*, 310 F. Supp. 3d at 1142–46 (finding family-separation likely violates substantive due process rights to family integrity under the Fifth Amendment); *see also Flores v. Reno*, No. 2:85-cv-4544, (ECF No. 177 at 5−6, 24) (C.D. Cal. July 24, 2015) (finding federal officials have a duty to preserve family units and promptly release minors in immigration custody).  Second, they must prioritize the release of minors to family members. 8 C.F.R. § 1236.3(b).  Third, they have a duty to permit detained parents to contact family members who were arrested with them. *Ms. L.*, 310 F. Supp. 3d at 1144–45, 1149–50.  Finally, they have a duty to ensure the prompt release of minors held in immigration custody.  *See* 8 U.S.C. § 1232(c); *see also* United Nations High Commissioner for Refugees, *Detention Guidelines: Guidelines on the Applicable Criteria and Standards Relating to the Detention of Asylum-Seekers and Alternatives to Detention* 34 (2012), http://www.unhcr.org/505b10ee9.html (children should as a general matter "not be detained at all").  Officials of the United States breached all four of these duties to Mr. Arredondo Rodriguez and Andrea.

61.     Similarly, the United States has a non-discretionary legal obligation to ensure that asylum seekers are not coerced into giving up immigration claims.  *See* 8 C.F.R. § 235.4 (an immigrant's "decision to withdraw his or her application for admission must be made voluntarily").  Nevertheless, the United States breached this obligation by implementing the family-separation policy, which was expressly aimed at traumatizing candidates for asylum to deter their lawful entry into the United States.  *Ms. L. v. U.S. Immigr. & Customs Enf't*, 403 F. Supp. 3d 853, 863 (S.D. Cal. 2019) (finding petitioner's choice to withdraw her asylum claim was not

voluntary because "she made her decision as a result of the continued separation from her child").

62.     Moreover, in separating Mr. Arredondo Rodriguez from Andrea, the government violated their fundamental constitutional and human right to familial association without a compelling interest. *See Quilloin v. Walcott*, 434 U.S. 246, 255 (1978) (citing *Wisconsin v. Yoder*, 406 U.S. 205, 231–33 (1972)) and *Meyer v. Nebraska*, 262 U.S. 390, 399–401 (1923). "Interference with" the "fundamental right to familial association" "requires a powerful countervailing interest." *United States v. Wolf Child*, 699 F.3d 1082, 1092 (9th Cir. 2012) (quoting *Lassiter v. Dep't of Soc. Servs.*, 452 U.S. 18, 27 (1981)); *Halet v. Wend Inv. Co.*, 672 F.2d 1305, 1310–11 (9th Cir. 1982) (requiring compelling interest to deprive parents of their "fundamental right" to "live with their children"). Yet, "nothing in federal law suggests that deterring immigration by indefinitely separating families once parents have been transferred to immigration custody is a compelling or legitimate government objective." *M.G.U. v. Nielsen*, 325 F. Supp. 3d 111, 121 (D.D.C. 2018). Thus, the government cannot establish a "powerful" or "compelling" interest to justify the family separation policy. Instead, with blatant disregard for Mr. Arredondo Rodriguez and Andrea's constitutional right to remain a family unit, the government tore them apart to traumatize them.

63.     In addition, Mr. Arredondo Rodriguez's separation from Andrea was in violation of their due-process rights. *Ms. L.*, 302 F. Supp. 3d 1149, 1166–67 (finding that the family-separation policy likely violated parents' and children's due-process rights); *see also C.M. v. United States*, No. CV-19-05217, 2020 WL 1698191, at *4 (D. Ariz. Mar. 30, 2020) (finding it plausible that the family-separation policy violated the family's constitutional rights). Separating parents from their children in such a traumatizing manner is "so egregious, so outrageous, that it may fairly be said to shock the contemporary conscience," so "brutal and offensive that it [does] not comport with traditional ideas of fair play and decency"

and so baseless that it "interferes with rights implicit in the concept of ordered liberty." *Ms. L.,* 310 F. Supp. 3d at 1144–46 (internal quotation marks omitted).

64.     In all, the government breached its duties to immigrant families in its treatment of Mr. Arredondo Rodriguez and Andrea.  More importantly, treatment of Mr. Arredondo Rodriguez and Andrea was unconstitutional.

## H.     Mr. Arredondo Rodriguez Suffers as a Result of the Separation from Andrea and His Mistreatment at the Hands of Government Officers

65.     Although Mr. Arredondo Rodriguez has been reunited with his family to pursue his claim for asylum, he continues to be greatly impacted by the government's wrongful conduct, including his prolonged separation from his children and his inhumane detention. Rather than acting as a safe haven, as contemplated by federal asylum law, the United States tortured and deported Mr. Arredondo Rodriguez in direct violation of its own laws.

66.     The trauma of his experience in U.S. custody compounded each time Mr. Arredondo learned that the U.S. government was resisting his return in the *Ms. L* case, despite having unlawfully deported him.  Mr. Arredondo Rodriguez's trauma intensified as he was forced to live in fear for his life and in hiding in Guatemala.  In a report by Physicians for Human Rights, clinicians found that deportation after family separation compounded parents' distress.[14] This distress led to ongoing functional impairment in victims of family separation.

67.     In turn, Mr. Arredondo Rodriguez continues to experience physical and psychological harm.  He still battles intense anxiety, coupled with flashbacks of Andrea being yanked from him.  He feels perpetually sad and anxious regardless of his daily reality.  He continues to struggle with sleep and at times feels overwhelmed by a great emptiness.  Most profoundly, Mr. Arredondo Rodriguez

---

[14] Brittney Bringuez et. al., *"Part of my heart was torn away": What the U.S. Government Owes the Tortured Survivors of Family Separation,* PHYSICIANS FOR HUMAN RIGHTS, (Apr. 19, 2022), https://phr.org/our-work/resources/part-of-my-heart-was-torn-away/.

suffers from "psychological castration." As a result, Mr. Arredondo Rodriguez struggles to reconnect with his identity as a father and protector. He feels impotent and helpless. This helplessness has extended into his once strong faith and has caused him to question his relationship to God, previously a source of comfort. Overall, Mr. Arredondo Rodriguez's symptoms have manifested into Posttraumatic Stress Disorder, Complex Type ("PTSD-C"), the most severe form of PTSD.

### I. Andrea Suffers as a Result of the Separation from her Father and Her Mistreatment at the Hands of Government Officers

68. The long-term effects of separation on Andrea will continue to be devastating throughout her life. The American Academy of Pediatrics has found that the separation of children from their parents under the zero-tolerance policy "'cause[d] irreparable harm' to children by inhibiting brain development and causing other long-term health problems." [15]

69. Andrea has been diagnosed with PTSD and other conditions.

### COUNT I
### INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS AGAINST MR. ARREDONDO RODRIGUEZ

70. Paragraphs 1 to 68 of this complaint are incorporated as if set forth herein.

71. By engaging in the acts described above, federal officials and agents, at the direction of the United States, engaged in extreme and outrageous conduct with the intent to cause, or with reckless disregard for the probability of causing, Mr. Arredondo Rodriguez to suffer severe emotional distress as a result of being separated from his child, his incarceration, the severe conditions of his incarceration, his wrongful deportation, and all of the other misconduct described herein.

---

[15] DURBIN ET. AL., *supra* note 7.

72.     As a direct and proximate result of the government's conduct, Mr. Arredondo Rodriguez has in fact suffered and continues to suffer severe emotional distress.

73.     Under the FTCA, the United States is liable to Mr. Arredondo Rodriguez for intentional infliction of emotional distress.

## COUNT II

## NEGLIGENCE ON BEHALF OF MR. ARREDONDO RODRIGUEZ

74.     Paragraphs 1 to 73 of this complaint are incorporated as if set forth herein.

75.     The federal officials referenced above had a duty to Mr. Arredondo Rodriguez to act with ordinary care so as not to cause harm or injury to Mr. Arredondo Rodriguez.

76.     By engaging in the acts alleged herein, federal officials, at the direction of the United States, failed to act with ordinary care and breached their duty of care to Mr. Arredondo Rodriguez.

77.     As a direct and proximate result of the above-referenced conduct, Mr. Arredondo Rodriguez suffered substantial damages.

78.     Under the FTCA, the United States is liable to Mr. Arredondo Rodriguez for negligence.

## COUNT III

## NEGLIGENT INFLICTION OF EMOTIONAL DISTRESS AGAINST MR. ARREDONDO RODRIGUEZ

79.     Paragraphs 1 to 78 of this complaint are incorporated as if set forth herein.

80.     By engaging in the acts described above, federal officials and agents, at the direction of the United States, engaged in negligent and grossly negligent conduct which caused Mr. Arredondo Rodriguez to suffer severe emotional distress as a result of being separated from his child, his incarceration, the severe

conditions of his incarceration, his wrongful deportation, and all of the other misconduct described herein.

81.     The federal officials referenced above had a duty to Mr. Arredondo Rodriguez to act with ordinary care so as not to cause harm or injury to Mr. Arredondo Rodriguez.

82.     By engaging in the acts alleged herein, federal officials, at the direction of the United States, failed to act with ordinary care and breached their duty of care to Mr. Arredondo Rodriguez.

83.     As a direct and proximate result of the government's conduct, Mr. Arredondo Rodriguez has in fact suffered and continues to suffer severe emotional distress.

84.     Under the FTCA, the United States is liable to Mr. Arredondo Rodriguez for negligent infliction of emotional distress.

<u>**COUNT IV**</u>
**INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS AGAINST ANDREA**

85.     Paragraphs 1 to 84 of this complaint are incorporated as if set forth herein.

86.     By engaging in the acts described above, federal officials and agents, at the direction of the United States, engaged in extreme and outrageous conduct with the intent to cause, or with reckless disregard for the probability of causing, Andrea to suffer severe emotional distress as a result of being separated from her father, her confinement, the severe conditions of her confinement, and all of the other misconduct described herein.

87.     As a direct and proximate result of the government's conduct, Andrea has in fact suffered and continues to suffer severe emotional distress.

88.     Under the FTCA, the United States is liable to Andrea for intentional infliction of emotional distress.

26

## COUNT V

### NEGLIGENCE ON BEHALF OF ANDREA

89.     Paragraphs 1 to 88 of this complaint are incorporated as if set forth herein.

90.     The federal officials and agencies referenced above had a duty to Andrea to act with ordinary care so as not to cause harm or injury to Andrea.

91.     By engaging in the acts alleged herein, federal officials and agencies, at the direction of the United States, failed to act with ordinary care and breached their duty of care to Andrea.

92.     As a direct and proximate result of the above-referenced conduct, Andrea suffered substantial damages.

93.     Under the FTCA, the United States is liable to Andrea for negligence.

## COUNT VI
### NEGLIGENT INFLICTION OF EMOTIONAL DISTRESS AGAINST ANDREA

94.     Paragraphs 1 to 93 of this complaint are incorporated as if set forth herein.

95.     By engaging in the acts described above, federal officials and agents and their agencies, at the direction of the United States, engaged in negligent and grossly negligent conduct which caused Andrea to suffer severe emotional distress as a result of being separated from her father, her confinement, and the conditions of her confinement.

96.     The federal officials and agencies referenced above had a duty to Andrea to act with ordinary care so as not to cause harm or injury to Andrea.

97.     By engaging in the acts alleged herein, federal officials and agencies, at the direction of the United States, failed to act with ordinary care, and breached their duty of care to Andrea.

98.     As a direct and proximate result of the government's conduct, Andrea has in fact suffered and continues to suffer severe emotional distress.

99.     Under the FTCA, the United States is liable to Andrea for negligent infliction of emotional distress.

## **PRAYER FOR RELIEF**

Wherefore, Plaintiff Mr. Arredondo Rodriguez on behalf of himself and his daughter, Andrea, respectfully requests:

(1)     Compensatory damages;

(2)     Any further relief that the Court deems appropriate.

Dated: April 28, 2022                    Respectfully submitted,

**MILBANK LLP**

By: _____
Linda Dakin-Grimm, SBN 119630
Ldakin-grimm@milbank.com
Asena Baran, SBN 342626
Abaran@milbank.com
Lya Ferreyra, SBN 340148
Lferreyra@milbank.com
2029 Century Park East, 33rd Floor
Los Angeles, CA  90067
Telephone: 424.386.4000
Facsimile: 213.629.5063

*Pro Bono* Attorneys for Plaintiff,
Esvin Fernando Arredondo Rodriguez

COMPLAINT FOR DAMAGES