MILBANK LLP
Linda Dakin-Grimm (State Bar #119630)
Mark Shinderman (State Bar #136644)
Samir L. Vora (State Bar #253772)
Marina Markarian (State Bar #340686)
2029 Century Park East, 33rd Floor
Los Angeles, CA  90067
Telephone: (213) 892-4404
Facsimile: (213) 629-5063
Email: Ldakin-grimm@milbank.com
Elizabeth Hamilton, *pro hac vice*
55 Hudson Yards, 34th Floor
New York, NY 10001-2163
Telephone: (212) 530-5000
Facsimile: (212) 530-5219
Email: Ehamilton@milbank.com
*Additional counsel listed on signature page

*Pro Bono* Attorneys for Plaintiffs,
Esvin Fernando Arredondo Rodriguez and A.F.A.J.

# UNITED STATES DISTRICT COURT
## FOR THE CENTRAL DISTRICT OF CALIFORNIA
## WESTERN DIVISION

| | |
|---|---|
| ESVIN FERNANDO ARREDONDO RODRIGUEZ INDIVIDUALLY AND A.F.A.J., A MINOR, BY HER GUARDIAN AD LITEM, JEFFREY HAMILTON,<br><br>Plaintiffs,<br><br>v.<br><br>UNITED STATES OF AMERICA,<br><br>Defendant. | Case No.: CV 22-02845-JLS-JC<br><br>**PLAINTIFFS' STATEMENT OF UNCONTROVERTED FACTS AND CONCLUSIONS OF LAW IN SUPPORT OF MOTION FOR PARTIAL SUMMARY JUDGMENT**<br><br>**Hearing Date:** February 16, 2024<br>**Hearing Time:** 10:30 a.m.<br>**Judge:** Hon. Josephine L. Staton<br>**Courtroom:** 8A |

Pursuant to Rule 56 of the Federal Rules of Civil Procedure and Local Rule 56-1, Plaintiffs Esvin Fernando Arredondo Rodriguez ("Mr. Arredondo") and his minor daughter A.F.A.J. (together, "Plaintiffs") submit the following Statement of Uncontroverted Facts in support of their Motion for Partial Summary Judgment.

**STATEMENT OF UNCONTROVERTED FACTS**

| | Uncontroverted Fact | Evidentiary Support |
|---|---|---|
| **1.** | The Department of Homeland Security's ("DHS") Customs and Border Protection ("CBP") agency issued "an agency-wide policy that sets forth the first nationwide standards which govern CBP's interaction with detained individuals," titled National Standards on Transport, Escort, Detention, and Search ("TEDS"), in October 2015. | U.S. Customs and Border Protection's National Standards on Transport, Escort, Detention, and Search (TEDS), at –158 (Oct. 2015) [Ex. B]. |
| **2.** | TEDS General Standard § 1.2 states that, "CBP employees must speak and act with the utmost integrity and professionalism.  CBP employees must conduct themselves in a manner that reflects positively on CBP at all times." | U.S. Customs and Border Protection's National Standards on Transport, Escort, Detention, and Search (TEDS), at –159, –171 (Oct. 2015) [Ex. B]. |
| **3.** | TEDS General Standard § 1.6 states that "Officers/Agents will consider the best interest of the juvenile at all decision points beginning at the first encounter and continuing through processing, detention, transfer, or repatriation.  Officers/Agents should recognize that juveniles experience situations differently than adults." | U.S. Customs and Border Protection's National Standards on Transport, Escort, Detention, and Search (TEDS), at –159 (Oct. 2015) [Ex. B]. |

| | | Uncontroverted Fact | Evidentiary Support |
|---|---|---|---|
| | **4.** | TEDS General Standard § 1.9 states that "CBP will maintain family unity to the greatest extent operationally feasible, absent a legal requirement or an articulable safety or security concern that requires separation." | U.S. Customs and Border Protection's National Standards on Transport, Escort, Detention, and Search (TEDS), at –159 (Oct. 2015) [Ex. B]. |
| | **5.** | TEDS General Standard § 4.12 states that "[c]lean bedding must be provided to juveniles.  When available, clean blankets must be provided to adult detainees upon request." | U.S. Customs and Border Protection's National Standards on Transport, Escort, Detention, and Search (TEDS), at –172 (Oct. 2015) [Ex. B]. |
| | **6.** | TEDS General Standard § 4.3 states that "[g]enerally, family units with juvenile should not be separated.  When it is necessary to separate juveniles from the parent(s) and/or legal guardian(s), officers/agents must follow their operational office's policies and procedures and appropriate legal requirements.  In circumstances where family units must be separated due to different immigration dispositions, such separation much be documented in the appropriate electronic system(s) of record." | U.S. Customs and Border Protection's National Standards on Transport, Escort, Detention, and Search (TEDS), at –169 (Oct. 2015) [Ex. B]. |
| | **7.** | TEDS General Standard § 4.7 states that "[w]hen it is within CBP control, officers/agents should | U.S. Customs and Border Protection's |

| | | Uncontroverted Fact | Evidentiary Support |
|---|---|---|---|
| | | maintain hold room temperature within a reasonable and comfortable range for both detainees and officers/agents.  Under no circumstances will officers/agents use temperature controls in a punitive manner." | National Standards on Transport, Escort, Detention, and Search (TEDS), at –171 (Oct. 2015) [Ex. B]. |
| | **8.** | TEDS General Standard § 5.6 states that hold rooms for unaccompanied children ('UAC') "must provide the following: [t]oilets and sinks; . . . [d]rinking fountains or clean drinking water along with clean drinking cups; [a]dequate temperature control and ventilation; and [c]lean bedding." | U.S. Customs and Border Protection's National Standards on Transport, Escort, Detention, and Search (TEDS), at –178 (Oct. 2015) [Ex. B]. |
| | **9.** | TEDS General Standard § 8.0 further states that "[c]omponents within CBP include[e] the Office of Field Operations, the U.S. Border Patrol, and the Office of Air and Marine." | U.S. Customs and Border Protection's National Standards on Transport, Escort, Detention, and Search (TEDS), at –184 (Oct. 2015) [Ex. B]. |
| | **10.** | When asked "why procedures regarding reunification of a child separated from their parent by DHS were implemented in September of 2016," former Office of Refugee Resettlement ("<u>ORR</u>") Deputy Director for Children's Programs Captain Jonathan White testified, "there  had been a number of cases for a long period of time of children who were  separated from a parent for what we then -- | Deposition of Capt. J. White at 46:25-47:14 (July 13, 2022) [Ex. QQQ]. |

| | Uncontroverted Fact | Evidentiary Support |
|---|---|---|
| | the term of art we then used was 'separations for cause' related to the . . . safety and well-being of the child. These were very rare events, but they did occur." | |
| 11. | The Department of Health and Human Services ("HHS") Office of Inspector General ("OIG") issued a brief in January 2019 regarding "Separated Children Placed in Office of Refugee Resettlement Care." | U.S. Department of Health & Human Services, Office of Inspector General Issue Brief, titled "Separated Children Placed in Office of Refugee Resettlement Care," at –282 [Ex. JJ]. |
| 12. | HHS OIG stated that "some children are referred to ORR after being separated by DHS from a parent or legal guardian with whom the child arrived. Historically, these separations were rare and occurred because of circumstances such as the parent's medical emergency or a determination that the parent was a threat to the child's safety." | U.S. Department of Health & Human Services, Office of Inspector General Issue Brief, titled "Separated Children Placed in Office of Refugee Resettlement Care," at –284 [Ex. JJ]. |
| 13. | **Intentionally left blank.** | |
| 14. | **Intentionally left blank.** | |
| 15. | Former President Trump issued Executive Order 13767 on January 25, 2017, stating that detention of individuals "apprehended on suspicion of violating | Executive Order 13767 at -512, -514 [Ex. D]. |

| | Uncontroverted Fact | Evidentiary Support |
|---|---|---|
| | Federal or State laws, including Federal immigration law" was the official policy of the executive branch.  The Executive Order "terminat[ed] [] the practice commonly known as 'catch and release.'" | |
| 16. | Former CBP Commissioner Kevin McAleenan testified that at a "February 14[, 2017] meeting, and really a series of meetings and a policy process after the January 25th executive order on ending catch and release and more security and a separate companion executive order on interior enforcement, was a -- a set of discussion and dialogues and policy processes to both respond to the very specific articulations in the executive order but also to develop policy options to achieve the intent of the rest of the direction in the executive order.  . . . And I believe ICE raised policy options for enhanced enforcement of immigration law to include prosecution and potential administrative separation." . | Deposition of K. McAleenan at 106:15–108:8 (Sept. 13, 2022) [Ex. TTT]; *see also* Deposition of T. Swartz at 10:15-11:7 (Sept. 7, 2022) [Ex. SSS]. |
| 17. | Former Associate Deputy Director of ORR Tricia Swartz testified that at the stated purpose of family separation was "to send a message to prevent or deter other migrant families from coming to the United States." | Deposition of T. Swartz at 11:18-12:2 (Sept. 7, 2022) [Ex. SSS]; Deposition of T. Swartz at 84:18-19 (May 24, 2022) [Ex. OOO]; Email from the former |

| | Uncontroverted Fact | Evidentiary Support |
|---|---|---|
| | | Deputy Director for Children's Programs of the Office of Refugee Resettlement, with the subject "ACF/ORR UC Bed Cascades Memo for 6 February 2017 – CBP Follow Up," at – 179 (Feb. 15, 2017) [Ex. F]; David Shepardson, Reuters, *Trump says family separations deter illegal immigration* [Ex. GG]; Philip Bump, Washington Post, *Here are the administration officials who have said that family separation is meant as a deterrent* (Jun. 19, 2018) [Ex. W]. |
| 18. | Former Associate Deputy Director of ORR Tricia Swartz further testified that family separation was proposed in furtherance of Executive Order 13767. | Deposition of T. Swartz at 17:3-8 (Sept. 7, 2022) [Ex. SSS]. |

| | | Uncontroverted Fact | Evidentiary Support |
|---|---|---|---|
| 1 | | | |
| 2 | 19. | Former Associate Deputy Director of ORR Tricia Swartz testified that following the February 14, 2017 meeting she "wanted to make sure that everyone, especially the legal teams, had been consulted to make sure that no one was doing anything that might violate any laws or standards." | Deposition of T. Swartz at 93:5-20 (May 24, 2022) [Ex. OOO]. |
| 20. | 20. | Former Associate Deputy Director of ORR Tricia Swartz testified that following the February 14, 2017 meeting she emailed herself "a list of potential problems that could be somehow involved in a family separation policy." | Deposition of T. Swartz at 95:18-96:11 (May 24, 2022) [Ex. OOO]. |
| 21. | 21. | The list of "[p]roblems" Associate Deputy Director Swartz identified with family separation included: "[n]ot in best interests of children," "[v]iolation of Social Worker ethics or facility standards," "[v]iolation of international law," "[r]efoulment concerns (removing without hearings)," "[h]uman rights abuse concerns (separating children from family)," and "ORR beds become punitive/deterrent rather than for care and custody." | List of "Problems" identified by T. Swartz (Feb. 15, 2017) [Ex. E]. |
| 22. | 22. | On February 16, 2017, Associate Deputy Director Swartz emailed Captain White stating, in part, "I'm suspicious that we may violate laws and human rights if we participate in this model of separating families for the purpose of causing pain to deter asylum seekers." | Email from the former Deputy Director for Children's Programs of the Office of Refugee Resettlement, with the subject "Family Unit |

| | Uncontroverted Fact | Evidentiary Support |
|---|---|---|
| | | data" (Feb. 16, 2017) [Ex. G]. |
| 23. | Associate Deputy Director Swartz testified she "was concerned that certain things could cause trauma including family separation." | Deposition of T. Swartz at 111:14-24 (May 24, 2022) [Ex. OOO]. |
| 24. | In a March 2017 interview, when asked if DHS was planning to implement a family separation policy, then DHS Secretary John Kelly stated, in part, "Yes, I'm considering [family separation], in order to deter more movement along this terribly dangerous network...It's more important to me [] to try to keep people off of this awful network," | Daniella Diaz, CNN, *Kelly: DHS Is Considering Separating Undocumented Children from Their Parents at the Border* (Mar. 7, 2017) [Ex. H]. |
| 25. | After the interview aired, 80 members of Congress wrote to Secretary Kelly expressing "deep concerns and opposition to an immigration enforcement proposal . . . to separate families and put children into the U.S. foster care system" and urging DHS "reconsider the implementation of this harmful immigration policy which will only serve to further traumatize families, overwhelm our child welfare system and roll back years of humanitarian progress." | Letter from Democratic Members of Congress to Secretary John Kelly (Mar. 8, 2017) [Ex. J]. |
| 26. | The March 8, 2017 letter from members of Congress to Secretary Kelly also stated "[t]he entire purpose of the child welfare system . . . is to *protect* children from abuse and neglect – not as a tool for punishing or criminalizing parents." | Letter from Democratic Members of Congress to Secretary John Kelly (Mar. 8, 2017) [Ex. J]. |

| | Uncontroverted Fact | Evidentiary Support |
|---|---|---|
| **27.** | On March 22, 2017 "184 organizations who serve or work on behalf of immigrants, refugees, asylum seekers, and children, [wrote] to express [] profound opposition to [Secretary Kelly's] recent proposal to separate migrant families arriving at our borders.  In addition to this proposed policy being fundamentally un-American and cruel, it is also profoundly misguided.  Family separation will only further traumatize those already fleeing harm, and will inhibit their ability to access a legal process to which they have a right under U.S. and international law." | Letter from immigrant rights organizations to Secretary John Kelly at –010 (Mar. 22, 2017) [Ex. L] |
| **28.** | The same March 27, 2017 letter went on to explain, "[t]he stated purpose for your proposal, to deter families from making the journey, neither justifies such an inherently cruel measure nor can it be met.  The families who are currently . . . presenting themselves at ports of entry are doing so because they feel they have no other choice for survival.  Deterrence efforts will have little effect when someone is fleeing harm and feels that have no other option but to seek protection elsewhere.  . . . Similar policies of detaining asylum-seeking families to deter their migration have already been found by a U.S. court to violate U.S. law." | Letter from immigrant rights organizations to Secretary John Kelly at –011-012 (Mar. 22, 2017) [Ex. L] |
| **29.** | On April 11, 2017, then Attorney General Jeffrey Sessions issued a memorandum titled, "Renewed | Memorandum re "Renewed Commitment |

| | Uncontroverted Fact | Evidentiary Support |
|---|---|---|
| | Commitment to Criminal Immigration Enforcement" in which he instructed prosecutors that several immigration-related offenses, including reentry of a previously removed individual under 8 U.S.C. § 1326, be prioritized for detention and prosecution. | to Criminal Immigration Enforcement" from Attorney General Jefferson Sessions at – 502 (Apr. 11, 2017) [Ex. M]. |
| 30. | HHS OIG found that "[i]n the summer of 2017, prior to the formal announcement of the zero-tolerance policy, ORR staff and officials observed a steep increase in the number of children who had been separated from a parent or guardian by DHA ('separated children') and subsequently referred to ORR for care." | U.S. Department of Health & Human Services, Office of Inspector General Issue Brief, titled "Separated Children Placed in Office of Refugee Resettlement Care" at – 282 (Jan. 2019) [Ex. JJ]. |
| 31. | "From July through November 2017, the El Paso sector of Customs and Border Protection . . . implemented new policies that resulted in 281 individuals in families being separated." | U.S. Department of Health & Human Services, Office of Inspector General Issue Brief, titled "Separated Children Placed in Office of Refugee Resettlement Care" at - 282, 284 (Jan. 2019) [Ex. JJ]. |

| | | Uncontroverted Fact | Evidentiary Support |
|---|---|---|---|
| | **32.** | Richard Durbin, a United States Attorney for the Western District of Texas (which encompasses El Paso), wrote to other Assistant United States Attorneys in the Western District of Texas on March 8, 2017, stating "I am very reluctant to start prosecuting family units.  History would not judge that kindly." | Email from Richard Durbin with the subject "Re: BP 132 Prosecutions & I-213s" (Mar. 8, 2017) [Ex. I]. |
| | **33.** | The Department of Justice ("DOJ") OIG issued a report titled "Review of the Department of Justice's Planning and Implementation of Its Zero Tolerance Policy and Its Coordination with the Departments of Homeland Security and Health and Human Services" in January 2021. | Department of Justice Office of the Inspector General report, "Review of the Department of Justice's Planning and Implementation of Its Zero Tolerance Policy and Its Coordination with the Departments of Homeland Security and Health and Human Services" (Jan. 2021) [Ex. III]. |
| | **34.** | The DOJ OIG report quotes United States Magistrate Judge Miguel Torres as saying in November 2017 that "[i]n a number of recent illegal entry cases over the last several months, the Court has repeatedly been apprised of concerns voiced by defense counsel and by defendants regarding their limited and often non-existent . . . information about | Department of Justice Office of the Inspector General report, "Review of the Department of Justice's Planning and Implementation of Its Zero Tolerance Policy |

| | Uncontroverted Fact | Evidentiary Support |
|---|---|---|
| | the well-being and whereabouts of their minor children from whom they were separated." | and Its Coordination with the Departments of Homeland Security and Health and Human Services" at -312 (Jan. 2021) [Ex. III]. |
| 35. | The DOJ OIG report states that "separations [in the El Paso sector], and the government's inability in many cases to identify the whereabouts of separated children, generated concerns from prosecutors, judges, and other stakeholders." | Department of Justice Office of the Inspector General report, "Review of the Department of Justice's Planning and Implementation of Its Zero Tolerance Policy and Its Coordination with the Departments of Homeland Security and Health and Human Services" at -294 (Jan. 2021) [Ex. III]. |
| 36. | The DHS OIG issued a report titled "DHS Lacked Technology Needed to Successfully Account for Separated Migrant Families" on November 25, 2019. | Office of Inspector General report, titled "DHS Lacked Technology Needed to Successfully Account for Separated Migrant Families" (Nov. 25, 2019) [Ex. YY]. |

| | Uncontroverted Fact | Evidentiary Support |
|---|---|---|
| **37.** | The DHS OIG Report states that "CBP headquarters personnel had been aware of the various system deficiencies related to tracking family separations since at least the El Paso initiative in 2017." | Office of Inspector General report, titled "DHS Lacked Technology Needed to Successfully Account for Separated Migrant Families" at -932 (Nov. 25, 2019) [Ex. YY]. |
| **38.** | The DHS OIG Report further states that, during the Initiative, "El Paso Sector agents requested assistance from CBP headquarters, but the necessary system changes were not made" because the requested changes to "track family separations was not a high enough priority to warrant the time and resources required for system modifications." | Office of Inspector General report, titled "DHS Lacked Technology Needed to Successfully Account for Separated Migrant Families" at -932-933 (Nov. 25, 2019) [Ex. YY]. |
| **39.** | On January 11, 2018, the American Academy of Pediatrics ("AAP") wrote to Secretary Nielsen to "urge [her] in the strongest possible terms to reject" a "policy that would separate children from their parents at the border." | Letter from the American Academy of Pediatrics to Secretary Nielsen at –509A (Jan. 11, 2018) [Ex. N]. |
| **40.** | The AAP "request[ed] to meet with [Nielsen] at [her] earliest convenience to discuss why [family separation] would be detrimental to the health, safety and well-being of children." | Letter from the American Academy of Pediatrics to Secretary Nielsen at –509A (Jan. 11, 2018) [Ex. N]. |

| | Uncontroverted Fact | Evidentiary Support |
|---|---|---|
| 41. | The AAP went on to explain that "[p]roposals to separate children from their families as a tool of law enforcement to deter immigration are inhumane and counterproductive.  Federal Authorities must exercise caution to ensure that the emotional and physical stress children experience as they seek refuge in the United States is not exacerbated by the additional trauma of being separated from their parents.  . . . Fear and stress, particularly prolonged exposure to serious stress without the buffering protection afforded by stable, responsive relationships—known as toxic stress—can harm the developing brain and harm short- and long-term health." | Letter from the American Academy of Pediatrics to Secretary Nielsen at -509A (Jan. 11, 2018) [Ex. N]. |
| 42. | Former DHS Chief of Staff Chad Wolf testified that non-governmental organizations also expressed concerns to Secretary Nielsen, testifying that "[g]enerally they brought up some of the same concerns, which is the, the effect it would have not only on the children but the parents." | Deposition of Chad Wolf 198:3-10 (June 7, 2022) [Ex. PPP]. |
| 43. | The Zero Tolerance Policy (the "Policy") was publicly announced on April 6, 2018 by then attorney general Jeff Sessions. | Memorandum re "Zero-Tolerance for Offenses Under 8 U.S.C. §1325(a)" from Attorney General Jefferson Sessions at |

| | Uncontroverted Fact | Evidentiary Support |
|---|---|---|
| | | 673 (Apr. 6, 2018) [Ex. 24 and 33]. |
| **44.** | The Policy targeted several immigration-related offenses, including 8 U.S.C. § 1325, crime of improper entry, and 8 U.S.C. § 1326, crime of reentry. | Office of the Inspector General report, "Special Review – Initial Observations Regarding Family Separation Issues Under the Zero Tolerance Policy" at –020 (Sept. 27, 2018) [Ex. FF]; Email chain describing the El Centro Sector's initial efforts under Zero Tolerance (May 4, 2018) [Ex. P]. |
| **45.** | DHS described the policy as applying to "all arriving families . . . regardless of whether the immigrants are seeking protection/status or whether they are crossing the border for economic/other reasons ('illegal')." | Office of Refugee Resettlement's Policy Document Regarding Unaccompanied Children at –801 (Mar. 15, 2017) [Ex. K]. |
| **46.** | When the Policy was announced there was no system in place to track family separations generally or at the Laredo port of entry specifically. | Email regarding Laredo Field Office efforts to track separations (Apr. 9, 2018) [Ex. LLL]. |

| | | Uncontroverted Fact | Evidentiary Support |
|---|---|---|---|
| | **47.** | ICE ERO Acting Deputy Assistant Director Robert Guadian testified that ERO learned about the Policy "at least my division found out about it[,] the same time the media found out about it.  There was no proactive like email to my knowledge or memo or a heads-up that this was going to be occurring.  I think we found out at the same time that everyone else found out." | Deposition of R. Guadian at 61:2-11 (Sept. 2, 2022) [Ex. RRR]. |
| | **48.** | Former Unit Chief of the ICE Juvenile & Family Residential Management Unit Mellissa Harper testified that she did not "remember any specific meetings or emails" that gave her "a heads up that there was going to be an increase in UAC under this Zero Tolerance and separation initiative." | Deposition of M. Harper at 110:4-9 (May 4, 2022) [Ex. NNN]. |
| | **49.** | Former Associate Deputy Director of ORR Tricia Swartz testified that she did not "recall" "hear[ing] of any planning discussions with anyone at ORR about how DHS's policy change might impact ORR." | Deposition of T. Swartz at 194:7–24 (May 24, 2022) [Ex. OOO]. |
| | **50.** | Former Associate Deputy Director of ORR Tricia Swartz testified that she had "the impression that they wanted to take children from parents keep them in different places.  I don't think there was any conversation about bringing them back together, but that act of having them apart was going to send a message to the communities that they should not come." | Deposition of T. Swartz at 14:6-13 (Sept. 7, 2022) [Ex. SSS]. |

| | Uncontroverted Fact | Evidentiary Support |
|---|---|---|
| **51.** | Defendant's DHS 30(b)(6) representative testified that ORR's policy for reunification of children did not change in connection with the Zero Tolerance Policy in 2018. | 30(b)(6) Deposition of J. Gonzalez at 68:10-25 (Dec. 5, 2023) [Ex. FFFF]. |
| **52.** | Defendant's DHS 30(b)(6) representative testified that ORR faced a "challenge [of] ensuring that we had a number of appropriate beds for the different age groups that were coming in and sibling groups, as far as operationally for us in the field to have appropriate, you know, case staffings and what-have-you as far as from the field perspective." | 30(b)(6) Deposition of J. Gonzalez at 75:17-76:10 (Dec. 5, 2023) [Ex. FFFF]. |
| **53.** | Guidance provided to the Laredo Office of Field Operations described the Policy as the "implement[ation] [of] President Trump's Executive Order 13767: Border Security and Immigration Enforcement Improvements." | Email from the Assistant Director Field Operations – Border Security at Laredo Field Office, attaching CBP public affairs guidance on increasing prosecutions at the border (May 7, 2018) [Ex. 28]. |
| **54.** | While the Laredo Office of Field Operations, including the Public Affairs-Media Division, understood the Policy "initiative" to be "USBP-centric," the Assistant Director of the Laredo Office of Field Operations instructed his subordinates that the policy as impacted the Office of Field | Email from the Assistant Director Field Operations – Border Security at Laredo Field Office, attaching CBP public affairs guidance |

| | Uncontroverted Fact | Evidentiary Support |
|---|---|---|
| | Operations responsibilities by including the separation of "family units in which the adult has criminal history and/or immigration violations." | on increasing prosecutions at the border (May 7, 2018) [Ex. 28]. |
| 55. | CBP's representative testified that during May and June 2018 it was the policy at ports of entry, including Laredo, to "detain[] people for criminality, prior immigration history." | 30(b)(6) Deposition of R. Harris at 273:6-25 (Dec. 8, 2023) [Ex. IIII]. |
| 56. | Laredo Office of Field Operations policy required the documenting of any denial of available detention space for a family unit in the I-213 narrative in the immigrant's A-File. | CBP memorandum issued by Commissioner Kevin K. McAleenan, titled "Interim Guidance on Preliminary Injunction in Ms. L v. ICE, No. 18-428 (C.D. Cal. June 26, 2018)" (Jun. 27, 2018) [Ex. Z]. |
| 57. | On June 1, 2018 DHS employee Ismael Guevara emailed that "[d]ue to the recent larger than usual amount of asylees that the Laredo Port Of Entry and surrounding ports have encountered during this week, placements for individuals, families, and unaccompanied children have been greatly impacted and delayed.  We have been communicating with ERO on a frequent basis; although placement is not being denied, we have been informed that they are | Email from a DHS employee at the Laredo Port of Entry (Jun. 2, 2018)[Ex. V]. |

| | Uncontroverted Fact | Evidentiary Support |
|---|---|---|
| | actively seeking space and will be taking custody of the asylees as placement becomes available." | |
| 58. | On April 11, 2018, days after the announcement of the Zero Tolerance Policy, family units approaching at ports of entry were separated. | *See* Email from the CBP-OFO Chief Supervisor at Hidalgo Port of Entry stating FAMUs are being separated (Apr. 11, 2018) [Ex. O]. |
| 59. | When asked about family separations in a May 10, 2018 interview Secretary Nielsen stated "if you break the law, we will refer you for prosecution. What that means, however, is if you are single adult, if you are part of a family, if you are pregnant, if you have any other condition, you're an adult and you break the law, we will refer you.  Operationally what that means is we will have to separate your family.  That's no different than what we do every day in every part of the United States—when an adult of a family commits a crime.  If you as a parent break into a house, you will be incarcerated by police and thereby separated from your family. We're doing the same thing at the border." | Email from the CBP Acting Deputy Commissioner forwarding transcript of Secretary Nielsen's interview with NPR (May 10, 2018) [Ex. Q]. |
| 60. | "In June of 2018, no centralized system existed to identify, track, or connect families separated by DHS." | U.S. Department of Health & Human Services, Office of Inspector General Issue |

| | Uncontroverted Fact | Evidentiary Support |
|---|---|---|
| | | Brief, titled "Separated Children Placed in Office of Refugee Resettlement Care," at -286 (Jan. 2019) [Ex. JJ]. |
| **61.** | CBP agent Hecmar Nieves testified that family separation is "heartbreaking" for both the parent and child and that the experience "is going to . . . hurt. Of course, it does." | Deposition of H. Nieves at 162:18-163:06 (Nov. 14, 2023) [Ex. YYY]. |
| **62.** | Associate Deputy Director of ORR Swartz testified that "I try not to think about the family separation at that time as that model stood in general . . . I try not to spend too much time thinking about it.  I try not to read materials about it.  Because it tends to make me feel the same sort of reactions that I had at the time of concern for the families, makes me feel anxious, so I try not to spend too much time thinking about it and reliving it." | Deposition of T. Swartz at 34:13-35:3 (Sept. 7, 2022) [Ex. SSS]. |
| **63.** | When asked if she considered "the government's use of immigration laws to intentionally separate children from their parents outrageous," Associate Deputy Director of ORR Swartz testified "I would consider it outrageous if outrageous means to cause rage or upset by the public . . . if outrageous means to cause upset by common -- by the common person then, yes, it did seem to be outrageous." | Deposition of T. Swartz at 297:9-23 (May 24, 2022) [Ex. OOO]. |

| | | Uncontroverted Fact | Evidentiary Support |
|---|---|---|---|
| | **64.** | On June 20, 2018, then President Trump issued Executive Order 13841, which states that "[i]t is also the policy of this Administration to maintain family unity, including by detaining alien families together where appropriate and consistent with law and available resources." | Executive Order 13841 at –248 (Jun. 20, 2018) [Ex. 26]. |
| | **65.** | The DHS OIG Report states that it "could not confirm the total number of families DHS separated during the Zero Tolerance period," but "estimated that Border Patrol agents [alone] separated 3,014 children from their families while the policy was in place." | Office of Inspector General report, "DHS Lacked Technology Needed to Successfully Account for Separated Migrant Families" at -926 (Nov. 25, 2019) [Ex. YY]. |
| | **66.** | HHS OIG reported that "[t]he total number of children separated from a parent or guardian by immigration authorities is unknown." | U.S. Department of Health & Human Services, Office of Inspector General Issue Brief, titled "Separated Children Placed in Office of Refugee Resettlement Care," at –282 (Jan. 2019) [Ex. JJ]. |
| | **67.** | Associate Deputy Director of ORR Swartz testified that during the period of family separations ORR had "difficulty in getting the location and the names and the A numbers of parents." | Deposition of T. Swartz at 164:20-165:10 (May 24, 2022) [Ex. OOO]. |

| | Uncontroverted Fact | Evidentiary Support |
|---|---|---|
| 68. | Defendant's DHS 30(b)(6) representative testified that if a child wants to call a parent who has been moved among or between facilities, ORR would have to "keep trying" and that "sometimes it's hard to track down [the parent's location]." | 30(b)(6) Deposition of J. Gonzalez at 109:10-23 (Dec. 5, 2023) [Ex. FFFF]. |
| 69. | In March 2020, HHS OIG issued another report titled "Communication and Management Challenges Impeded HHS's Response to the Zero-Tolerance Policy" | Office of Inspector General report, "Communication and Management Challenges Impeded HHS's Response to the Zero-Tolerance Policy" [Ex. EEEE]. |
| 70. | HHS OIG reported that ORR-contracted facilities "commonly indicated that they encountered difficulties when trying to locate parents in DHS or DOJ custody. . . . A program director estimated that overall, it took an average of 2 weeks to locate parents and then an additional 3 to 7 days to arrange a phone call between the parent and child, a necessary first step before reunification could be pursued." | Office of Inspector General report, "Communication and Management Challenges Impeded HHS's Response to the Zero-Tolerance Policy" at -209 (Mar. 2020) [Ex. EEE]. |
| 71. | In February 2018, Ms. L, a migrant mother who was forcibly separated from her minor daughter pursuant to ICE's family separation policy, initiated a lawsuit in the Southern District of California against ICE (the "*Ms. L* Action"). | *Ms. L. v. U.S. Immigr. & Customs Enf't*, 310 F. Supp. 3d 1133, 1137-38 (S.D. Cal. 2018), modified, 330 F.R.D. |

| | Uncontroverted Fact | Evidentiary Support |
|---|---|---|
| | | 284 (S.D. Cal. 2019) [Ex. 91]. |
| **72.** | The *Ms. L* Action was converted into a class action lawsuit to include hundreds of other plaintiffs who were separated from their families following either their lawful presentation at ports of entry or illegal crossing between ports of entry. | *Ms. L. v. U.S. Immigr. & Customs Enf't*, 310 F. Supp. 3d 1133, 1139 (S.D. Cal. 2018), modified, 330 F.R.D. 284 (S.D. Cal. 2019) [Ex. 91]. |
| **73.** | The *Ms. L* Action sought a class wide preliminary injunction to halt ICE's implementation of a family separation policy and to reunite separated class members. | *Ms. L. v. U.S. Immigr. & Customs Enf't*, 310 F. Supp. 3d 1133, 1139 (S.D. Cal. 2018), modified, 330 F.R.D. 284 (S.D. Cal. 2019) [Ex. 91]. |
| **74.** | After then-President Donald Trump issued Executive Order 13841, attorneys for the United States in the *Ms. L* Action then argued that Judge Sabraw need not rule on the preliminary injunction in light of the executive order. | Respondents' Supplemental Response in Opposition to Motion for Preliminary Injunction, *Ms. L. v. U.S. Immigr. & Customs Enf't*, No. 18-0428, (S.D. Cal. June 26, 2018), ECF No. 79 [Ex. MM]. |

| | | Uncontroverted Fact | Evidentiary Support |
|---|---|---|---|
| | **75.** | On June 26, 2018, United States District Judge Dana M. Sabraw found that "recent events confirm[ed]" plaintiffs' allegations that the "Government was engaged in a widespread practice of separating migrant families, and placing minor children who were separated from their parents in government facilities for 'unaccompanied minors,'" and that "the practice was applied indiscriminately, and separated even those families with small children and infants—many of whom were seeking asylum." | *Ms. L. v. U.S. Immigr. & Customs Enf't*, 310 F. Supp. 3d 1133, 1136 (S.D. Cal. 2018), modified, 330 F.R.D. 284 (S.D. Cal. 2019) [Ex. 91]. |
| | **76.** | On June 26, 2018, Judge Sabraw "preliminarily enjoined [the Government] from detaining Class Members in DHS custody without and apart from their minor children, absent a determination that the parent is unfit or presents a danger to the child, unless the parent affirmatively, knowingly, and voluntarily declines to be reunited with the child in DHS custody." | *Ms. L. v. U.S. Immigr. & Customs Enf't*, 310 F. Supp. 3d 1133, 1149 (S.D. Cal. 2018), modified, 330 F.R.D. 284 (S.D. Cal. 2019) [Ex. 91]. |
| | **77.** | Judge Sabraw "preliminarily enjoined [the Government] from removing any Class Members without their child, unless the Class Member affirmatively, knowingly, and voluntarily declines to be reunited with the child prior to the Class Member's deportation, or there is a determination that the parent is unfit or presents a danger to the child." | *Ms. L. v. U.S. Immigr. & Customs Enf't*, 310 F. Supp. 3d 1133, 1149 (S.D. Cal. 2018), modified, 330 F.R.D. 284 (S.D. Cal. 2019) [Ex. 91].. |

| | | Uncontroverted Fact | Evidentiary Support |
|---|---|---|---|
| | **78.** | Judge Sabraw also ordered the Government to "reunify all Class Members with their minor children age five (5) and over within thirty (30) days of the entry of this Order." | *Ms. L. v. U.S. Immigr. & Customs Enf't*, 310 F. Supp. 3d 1133, 1149 (S.D. Cal. 2018), modified, 330 F.R.D. 284 (S.D. Cal. 2019) [Ex. 91]. |
| | **79.** | Following Executive Order 13841 and the injunction issued by Judge Sabraw, officials stopped separating family units entering at a port of entry when the adult had a prior immigration violation. | Email from the Assistant Port Director of CBP, to the U.S Attorney for the Western District of Texas (Jun. 22, 2018) [Ex. X]; Email from a CBP employee to the Assistant Port Director of CBP with the subject, "new guidance on family units" (Jun. 22, 2018) [Ex. Y]. |
| | **80.** | On June 27, 2018, then Commissioner Kevin K. McAleenan issued a memorandum titled "Interim Guidance on Preliminary Injunction in *Ms. L. v. ICE*, No. 18-428 (C.D. Cal. June 26, 2018)." The memorandum instructs Border Patrol and Office of Field Operations staff that, following the injunction, "[p]arents/legal guardians may be separated from | CBP memorandum issued by Commissioner Kevin K. McAleenan, "Interim Guidance on Preliminary Injunction in *Ms. L v. ICE*, No. 18- |

-26-

| | Uncontroverted Fact | Evidentiary Support |
|---|---|---|
| | their child for only the following reasons: 1. Referral if a parent/legal guardian for prosecution for a felony. . . . 2. Parent/legal guardian presents a danger to the child.  3. The parent/legal guardian has a criminal conviction(s) for violent misdemeanors or felonies.  . . . 4. The parent/legal guardian has a communicable disease." | 428 (C.D. Cal. June 26, 2018) (Jun. 27, 2018) [Ex. Z]. |
| 81. | On June 28, 2018, the Assistant Director of the Laredo Office of Field Operations forwarded then Commissioner McAleenan's June 27, 2018, memorandum with the message, "[p]lease read below because it is a change to the way we have being [sic] business." | Email from the Assistant Director Field Operations at the Laredo Field Office, attaching "Interim Guidance on Preliminary Injunction" (Jun. 28, 2018) [Ex. AA]. |
| 82. | On June 28, 2018, Chief CBP Officer, Program Manager – Border Security at the Laredo Office of Field Operations sent guidance on complying with then Commissioner McAleenan's June 27, 2018, memorandum; instructing Laredo Office of Field Operations staff that following the Ms. L injunction, "[p]rior immigration violations and/or convictions should not be considered when determining whether to separate a parent/legal guardian from a child/children." | Email from the Chief CBP Officer at the Laredo Field Office, with subject "Preliminary Injunction" (Jun. 28, 2018) [Ex. BB]; Email from a Supervisory CBP Officer, with subject "Disposition of Family Units / Interim |

| Uncontroverted Fact | Evidentiary Support |
|---|---|
| | Guidance on Preliminary Injunction" (Jun. 28, 2018) [Ex. CC]. |
| 83. On June 29, 2018, the Laredo Office of Field Operations received a memorandum instructing them that "[c]onsistent with the Executive Order (EO) 'Affording Congress An Opportunity to Address Family Separation' issued June 20, 2018, the preliminary injunction in *Ms. L v. ICE*, No. 18-848 (S.D. Cal.), and CBP National Standards on Transport, Escort, Detention, and Search (TEDS), U.S. Customs and Border Protection (CBP) Office of Field Operations (OFO) will maintain family unity and custody together to the greatest extent permitted by law and operational feasibility pending any criminal prosecution or immigration proceedings involving their members." | Email from the Assistant Director of Field Operations, regarding memorandum from the Office of Field Operations with subject "Inspecting Inadmissible Family Units and Updates to Secure Integrated Government Mainframe Access (SIGMA)" (Jun. 29, 2018) [Ex. DD]. |
| 84. DOJ OIG found that "the OAG's stated expectations of how the family separation process would work demonstrated a lack of understanding of the legal framework governing DHS's detention of alien children and significantly underestimated the complexities of the prosecution process." | Department of Justice Office of the Inspector General report titled "Review of the Department of Justice's Planning and Implementation of Its Zero Tolerance Policy and Its Coordination |

| | Uncontroverted Fact | Evidentiary Support |
|---|---|---|
| | | with the Departments of Homeland Security and Health and Human Services," at –294 (Jan. 2021) [Ex. III]. |
| **85.** | On July 16, 2018, Judge Sabraw granted an emergency temporary restraining order staying the Defendant from "remov[ing] parents until (1) week <u>after</u> they have been reunited with their children[.]" | Plaintiffs' Motion for Stay of Removal and Emergency TRO Pending Ruling on the Stay Motion, *Ms. L. v. U.S. Immigr. & Customs Enf't*, No. 18-0428, (S.D. Cal. July 16, 2018), ECF No. 110, at 1 [Ex. NN]; Order (1) Granting Plaintiffs' Motion for Emergency TRO Pending Ruling on Motion to Stay and (2) Amending July 13, 2018 Order Following Status Conference, *Ms. L. v. U.S. Immigr. & Customs Enf't*, No. 18-0428, (S.D. Cal. July |

| | Uncontroverted Fact | Evidentiary Support |
|---|---|---|
| | | 16, 2018), ECF No. 116, at 1 [Ex. OO]. |
| 86. | On August 16, 2018, Judge Sabraw entered a temporary restraining order in a related class action case involving the minor children of *Ms. L* class members, prohibiting Defendant "from removing from the United States. . . (a) All adult parents who enter the United States at or between designated ports of entry who (1) have been, are, or will be detained in immigration custody by the DHS, and (2) have a minor child who is or will be separated from them by DHS and detained in ORR custody, ORR foster care, or DHS custody, absent a determination that the parent is unfit or presents a danger to the child" and ordered Defendant to "immediately provide a copy of this Order to any person or entity that may be subject to any provision of this Order[.]" | Order Granting Plaintiffs' Motion for Temporary Restraining Order, *M.M.M. v. Sessions, et al.*, No. 18-1832, (S.D. Cal. Aug. 16, 2018), ECF No. 55, at 15 [Ex. LL]. |
| 87. | As a result of increasing crime, beginning in later 2016, Mr. Arredondo and some neighbors established a watch group. | Psychological Evaluation of Esvin Fernando Arredondo Rodriguez, conducted by Amy J. Cohen, MD, at –023 (Jun. 13, 2020) [Ex. HHH]. |
| 88. | "About 3 months after the start of this neighborhood watch, Mr. Arredondo was twice approached and | Psychological Evaluation of Esvin |

-30-

| | Uncontroverted Fact | Evidentiary Support |
|---|---|---|
| | threatened by gang members while in his taxi.  On the first occasion, two men came to the window of his car and accused him of being part of the watch group.  Mr. Arredondo denied this, claiming he only drove to the neighborhood to collect or drop off a fare.  But on another occasion, while stopped in traffic, he was approached again, told that the gang was watching him, knew that he was part of the protection group, and could kill him." | Fernando Arredondo Rodriguez, conducted by Amy J. Cohen, MD, at –023 (Jun. 13, 2020) [Ex. HHH]. |
| **89.** | On April 28, 2017, Mr. Arredondo's son (A.F.A.J.'s brother) was murdered by gang members as he sat on the porch of his grandmother's house. | Plaintiff Esvin Fernando Arredondo Rodriguez's Declaration in Support of Request to be Returned to U.S. to Apply for Asylum, at –330 (Dec. 6, 2018) [Ex. HH]. |
| **90.** | Due to continued persecution, Mr. Arredondo along with his wife and three daughters fled their home in February 2018. | Plaintiff Esvin Fernando Arredondo Rodriguez's Declaration in Support of Request to be Returned to U.S. to Apply for Asylum, at –330 (Dec. 6, 2018) [Ex. HH]. |
| **91.** | While journeying through Mexico, Mr. Arredondo and A.F.A.J. were delayed by Mexican authorities | Plaintiff Esvin Fernando Arredondo |

| | Uncontroverted Fact | Evidentiary Support |
|---|---|---|
| | causing them to arrive in the United States after his wife, Cleivi Marilu Jerez Lara ("Mrs. Jerez Lara") and two other daughters, Keyli Yetsari Arredondo Jerez ("Keyli") and A.S.A.J. | Rodriguez's Declaration in Support of Request to be Returned to U.S. to Apply for Asylum, at – 330 (Dec. 6, 2018) [Ex. HH]. |
| 92. | On May 16, 2018, Mr. Arredondo and A.F.A.J. arrived together at the Laredo port of entry. | Plaintiff Esvin Fernando Arredondo Rodriguez's Declaration in Support of Request to be Returned to U.S. to Apply for Asylum, at – 330 (Dec. 6, 2018) [Ex. HH]; Plaintiff Esvin Fernando Arredondo Rodriguez's A-file, at – 883–886 [Ex. 29]. |
| 93. | Mr. Arredondo and A.F.A.J. legally entered the United States and requested asylum. | Transcript of Telephonic Status Conference at 19:1 (Nov. 21, 2023) [Ex. AAAA]; *see also id.* at 13:14-20; *Ms. L v. U.S. Immigr. & Customs Enf't*, 403 F. Supp. 3d 853, 857 (S.D. Cal. 2019) [Ex. XX]. |

| | | Uncontroverted Fact | Evidentiary Support |
|---|---|---|---|
| | **94.** | When the first officer that Mr. Arredondo and A.F.A.J. encountered at the port of entry asked why they "wanted to enter the United States," Mr. Arredondo explained to the officer that his son had been murdered. | Deposition of Plaintiff A.F.A.J. at 24:22-25:4 (Nov. 29, 2023) [Ex. BBBB]. |
| | **95.** | CBP officials at Laredo recorded that Mr. Arredondo "expressed Credible Fear of returning to his home country of Guatemala" in his I-213 form. | Plaintiff Esvin Fernando Arredondo Rodriguez's A-file at – 884 [Ex. 29]. |
| | **96.** | When asked why he entered the country legally, Mr. Arredondo testified "I didn't -- I didn't want to -- want to risk my family or my daughter;" he believed that going to a port of entry was safer "[b]ecause if was going to be something legal." | Deposition of Plaintiff E.F.A.R. at 38:1-10 (Nov. 30, 2023) [Ex. CCCC]. |
| | **97.** | On May 16, 2018, A.F.A.J. was issued a DHS Notice to Appear Form I-862 stating, in part, "On May 16, 2018 you applied for admission into the United States at the Port of Entry in Laredo, Texas." | Form I-862, Notice to Appear for Plaintiff A.F.A.J. at –105 (May 16, 2018) [Ex. R]. |
| | **98.** | On May 18, 2023, DHS Form I-213 was completed stating, in part, that Mr. Arredondo "was willing to answer any questions regarding his application for admission into the United States." | Plaintiff Esvin Fernando Arredondo Rodriguez's A-file, at -885; -934-936 [Ex. 29]. |
| | **99.** | Mr. Arredondo's I-213 also states that a records check was done and Mr. Arredondo "has no criminal history and no other derogatory information was found in CBP databases." | Plaintiff Esvin Fernando Arredondo Rodriguez's A-file, at -885 [Ex. 29]. |

| | | Uncontroverted Fact | Evidentiary Support |
|---|---|---|---|
| | **100.** | CBP officials at Laredo determined A.F.A.J. to be an Unaccompanied Alien Child. | Plaintiff A.F.A.J.'s Detainee Assessment, at –188 (May 16, 2018) [Ex. 14]. |
| | **101.** | The I-213 notes that "at the time of entry subject . . . was traveling with his daughter, [A.F.A.J.] . . . [who was] processed as an Unaccompanied Child because of [Mr. Arredondo's] previous immigration violation." | Plaintiff Esvin Fernando Arredondo Rodriguez's A-file, at –886 [Ex. 29]. |
| | **102.** | When asked what happened after he crossed the Laredo bridge, Mr. Arredondo testified that he and A.F.A.J. "got in line like everybody else does when crossing" the first officer "asked me for my ID, and I told him that I didn't have any and that I was here to turn myself in." | Deposition of Plaintiff E.F.A.R. at 39:6-22 (Nov. 30, 2023) [Ex. CCCC]. |
| | **103.** | Plaintiff A.F.A.J. testified that the first officer to approach plaintiffs at the port of entry asked Mr. Arredondo "why he wanted to enter the United States" and Mr. Arredondo "started explaining about [A.F.A.J.'s] brother" being murdered in Guatemala. | Deposition of Plaintiff A.F.A.J. at 24:22-25:4 (Nov. 29, 2023) [Ex. BBBB]. |
| | **104.** | Mr. Arredondo and A.F.A.J. were then taken to a second line where they waited for an hour or two. | Deposition of Plaintiff E.F.A.R. at 40:6-17 (Nov. 30, 2023) [Ex. CCCC]. |
| | **105.** | After waiting in the second line, Mr. Arredondo testified that he and A.F.A.J. were taken into a room | Deposition of Plaintiff E.F.A.R. at 42:19-43:4 |

| | Uncontroverted Fact | Evidentiary Support |
|---|---|---|
| | where the officer "put us up against the wall, and they took everything from us -- everything we had. . . . They searched us.  The female officer searched [A.F.A.J.].  And then a male officer came, searched me, and took -- and they took all of our belongings." | (Nov. 30, 2023) [Ex. CCCC]. |
| **106.** | Defendant's CBP 30(b)(6) witness testified that during the intake process "one of the first things that's going to happen is adults are going to be given what we call a pat-down search or personal search.  They will be searched by two officers of the appropriate gender, you know, and all that's going to be annotated." | 30(b)(6) Deposition of R. Harris at 144:6-12 (Dec. 8, 2023) [Ex. IIII]. |
| **107.** | Mr. Arredondo testified that he and A.F.A.J. were then taken to another holding room, together, small, cold room where they waited for several hours. | Deposition of Plaintiff E.F.A.R. at 47:9-16; 48:20-25 (Nov. 30, 2023) [Ex. CCCC]. |
| **108.** | Defendant's CBP 30(b)(6) witness testified that after the initial intake and pat-down, "if there's space in the hard secondary area . . . [applicants] would be escorted into that hard secondary area." | 30(b)(6) Deposition of R. Harris at 145:1-4 (Dec. 8, 2023) [Ex. IIII]. |
| **109.** | Mr. Arredondo testified that this holding room had no chairs, they could only sit on the floor, and there was no restroom. | Deposition of Plaintiff E.F.A.R. at 46:12-14, 47:6-8 (Nov. 30, 2023) [Ex. CCCC]. |
| **110.** | When asked about the temperature in this holding room, Mr. Arredondo testified that it was "[c]old. Very cold." | Deposition of Plaintiff E.F.A.R. 48:20-25 |

| | Uncontroverted Fact | Evidentiary Support |
|---|---|---|
| | | (Nov. 30, 2023) [Ex. CCCC]. |
| **111.** | Mr. Arredondo asked permission to get a sweater from his confiscated suitcase to keep A.F.A.J. warm, but the officer refused.  Mr. Arredondo tried to keep A.F.A.J. warm by holding "her next to me, hugging her all the time." | Deposition of Plaintiff E.F.A.R. at 49:1-15 (Nov. 30, 2023) [Ex. CCCC]. |
| **112.** | Defendant's CBP 30(b)(6) witness testified that Laredo has a "stack of clothing, new clothing" available for someone who is cold, and "if someone's clothes are soiled, not appropriate for the weather, wet, you know, whatever the case is, we have plenty of clothing to give people. We have all ages from, you know, infants to adults." | 30(b)(6) Deposition of R. Harris 81:2-9 (Dec. 8, 2023) [Ex. IIII]. |
| **113.** | Mr. Arredondo testified that after waiting for several hours, "they took my daughter and me to an office -- to an area where they took our statements." | Deposition of Plaintiff E.F.A.R. 51:8-12 (Nov. 30, 2023) [Ex. CCCC]. |
| **114.** | Mr. Arredondo testified that the officer who took his and A.F.A.J.'s statements spoke "[v]ery little" Spanish. | Deposition of Plaintiff E.F.A.R. 52:7-8 (Nov. 30, 2023) [Ex. CCCC]. |
| **115.** | The CBP official who took Mr. Arredondo's sworn statement, Mr. Hugo Elguezabal, testified that although he is proficient in Spanish, he is not able to translate to Spanish all language appearing on the Record of Sworn Statement form. | Deposition of H. Elguezabal at 140:16-21; 204:4-24 (Nov. 17, 2023) [Ex. ZZZ]. |
| **116.** | Mr. Arredondo's signed Record of Sworn Statement, which is in English, indicates that he | Plaintiff Esvin Fernando Arredondo |

| | Uncontroverted Fact | Evidentiary Support |
|---|---|---|
| | came to the United States to "seek asylum" and for help because "it is dangerous where I live. The local gangs killed my oldest son and we were always looking out for them." | Rodriguez's A-file, at – 905 [Ex. 29]. |
| 117. | Mr. Arredondo's signed Record of Sworn Statement reflects that he informed the CBP official taking his statement, Mr. Hugo Elguezabal, that he was previously arrested "in 2006 with Border Patrol when I was here illegally." | Plaintiff Esvin Fernando Arredondo Rodriguez's A-file, at – 905 [Ex. 29]. |
| 118. | Mr. Arredondo testified, "I don't remember [the officer] showing me anything in Spanish. Everything was in English." | Deposition of Plaintiff E.F.A.R. at 67:14-15 (Nov. 30, 2023) [Ex. CCCC]. |
| 119. | After giving his statement, Mr. Arredondo testified that an officer came over and told him "[y]our daughter can't be with you here. We are going to take her to another place where there are more children." | Deposition of Plaintiff E.F.A.R. at 58:12-23 (Nov. 30, 2023) [Ex. CCCC]; Plaintiff Esvin Fernando Arredondo Rodriguez's Declaration in Support of Request to be Returned to U.S. to Apply for Asylum, at – 330 (Dec. 6, 2018) [Ex. HH]. |
| 120. | Mr. Arredondo testified that "[t]he officer came over. He stood next to my daughter. And he took her, like, from her arm. And my daughter lunged at | Deposition of Plaintiff E.F.A.R. at 61:23-62:8 (Nov. 30, 2023) [Ex. |

| | Uncontroverted Fact | Evidentiary Support |
|---|---|---|
| | me and hugged me like this.  She didn't want to go with the officer.  I was asking the officer, 'Where are you taking her to?' I was asking, 'Where are you taking her?  Where to?' And he wouldn't answer any -- anything.  He -- they never answered anything. | CCCC]; Deposition of Plaintiff A.F.A.J. at 38:11-16 (Nov. 29, 2023) [Ex. BBBB]; Pl. E.F.A.R.'s Rs & Os to Defendant's Interrog., at 11-13 (Oct. 23, 2023) [Ex. WWW]; Plaintiff Esvin Fernando Arredondo Rodriguez's Declaration in Support of Request to be Returned to U.S. to Apply for Asylum, at – 330 (Dec. 6, 2018) [Ex. HH]. |
| **121.** | A.F.A.J. immediately started crying.  Mr. Arredondo testified that "[m]y daughter couldn't speak.  She was crying and she -- she was just grabbing me." | Plaintiff Esvin Fernando Arredondo Rodriguez's Declaration in Support of Request to be Returned to U.S. to Apply for Asylum, at – 330-331 (Dec. 6, 2018) [Ex. HH]; Deposition of Plaintiff E.F.A.R. at 62:12-15; 63:5-9 (Nov. 30, 2023) [Ex. CCCC]; |

| | Uncontroverted Fact | Evidentiary Support |
|---|---|---|
| | | Deposition of Plaintiff A.F.A.J. at 37:10-12 (Nov. 29, 2023) [Ex. BBBB]; |
| 122. | Mr. Arredondo felt hopeless and embarrassed in that moment.  He felt that there was nothing he could do to protect his daughter and feared that he would never see her again. | Plaintiff Esvin Fernando Arredondo Rodriguez's Declaration in Support of Request to be Returned to U.S. to Apply for Asylum, at – 331 (Dec. 6, 2018) [Ex. HH]. |
| 123. | A.F.A.J. testified that the officer "just grabbed me by the arm and pulled me" hurting her left arm. | Deposition of Plaintiff A.F.A.J. at 37:20-38:6 (Nov. 29, 2023) [Ex. BBBB]. |
| 124. | A.F.A.J. was taken to a room with other children. | Deposition of Plaintiff A.F.A.J. at 38:9-10 (Nov. 29, 2023) [Ex. BBBB]. |
| 125. | A.F.A.J. was kept in that room without any bedding and without apparent access to a toilet. | Deposition of Plaintiff A.F.A.J. at 39:6-10 (Nov. 29, 2023) [Ex. BBBB]. |
| 126. | After A.F.A.J. was taken from him, Mr. Arredondo was then taken to another holding cell where he was | Plaintiff Esvin Fernando Arredondo Rodriguez's Declaration |

| | Uncontroverted Fact | Evidentiary Support |
|---|---|---|
| | held with other parents who had been separated from their children. | in Support of Request to be Returned to U.S. to Apply for Asylum, at – 331 (Dec. 6, 2018) [Ex. HH]; Deposition of Plaintiff E.F.A.R. at 71:11-72:1 (Nov. 30, 2023) [Ex. CCCC]. |
| **127.** | While in the second holding cell Mr. Arredondo repeatedly asked the officers for information about A.F.A.J. but was ignored as were the other parents. | Plaintiff Esvin Fernando Arredondo Rodriguez's Declaration in Support of Request to be Returned to U.S. to Apply for Asylum, at - 331 (Dec. 6, 2018) [Ex. HH]. |
| **128.** | Mr. Arredondo testified that in the early morning hours he and the other parents "were able to see, through the window that was on the door, that they had lined up all the children.  They were going to take them away." | Deposition of Plaintiff E.F.A.R. at 72:7-12 (Nov. 30, 2023) [Ex. CCCC]; Plaintiff Esvin Fernando Arredondo Rodriguez's Declaration in Support of Request to be Returned to U.S. to Apply for Asylum, at - 331 (Dec. 6, 2018) [Ex. HH]. |

| | Uncontroverted Fact | Evidentiary Support |
|---|---|---|
| **129.** | Mr. Arredondo testified that he and the other parents "started banging on the doors, asking 'Where are you taking them?' But no one would say anything." | Deposition of Plaintiff E.F.A.R. at 72:20-73:6 (Nov. 30, 2023) [Ex. CCCC]; Plaintiff Esvin Fernando Arredondo Rodriguez's Declaration in Support of Request to be Returned to U.S. to Apply for Asylum, at -331 (Dec. 6, 2018) [Ex. HH]. |
| **130.** | Mr. Arredondo was not given a phone number or means of contact for A.F.A.J. | Plaintiff Esvin Fernando Arredondo Rodriguez's Declaration in Support of Request to be Returned to U.S. to Apply for Asylum, at –331 (Dec. 6, 2018) [Ex. HH]. |
| **131.** | A.F.A.J. was placed in a van with other children and driven from Laredo to San Antonio, Texas. | Deposition of Plaintiff A.F.A.J. at 39:14-41:15 (Nov. 29, 2023) [Ex. BBBB]. |
| **132.** | A.F.A.J. was not informed of where she was being transported or of the reason for her separation. | 30(b)(6) Deposition of R. Harris at 270:11-271:9 (Dec. 8, 2023) [Ex. IIII]; Deposition of |

| Uncontroverted Fact | Evidentiary Support |
|---|---|
| | Plaintiff A.F.A.J. at 38:11-16; 42:16-25 (Nov. 29, 2023) [Ex. BBBB]; 30(b)(6) Deposition of J. Gonzalez at 118:17-121:15 (Dec. 5, 2023) [Ex. FFFF]. |
| **133.** On May 17, 2018 A.F.A.J. was admitted to Baptist Child and Family Services ("<u>BCFS</u>"), an ORR contracted facility. | Plaintiff A.F.A.J.'s BCFS Personal Data Form, at –005 (May 17, 2018) [Ex. 48]; Plaintiff A.F.A.J.'s BCFS Admission Acknowledgment Form, at –013 [Ex. 49]; Deposition of Plaintiff A.F.A.J. 42:21-25 (Nov. 29, 2023) [Ex. BBBB]; Plaintiff A.F.A.J.'s Reponses and Objections to Defendant U.S.A.'s Rs & Os to Defendant's Interrog. (Set One), at 6 (Nov. 9, 2023) [Ex. XXX]. |

| | Uncontroverted Fact | Evidentiary Support |
|---|---|---|
| **134.** | The intake form completed by BCFS indicates that A.F.A.J. refused her first meal after arrival at BCFS. | Plaintiff A.F.A.J.'s BCFS Intake Checklist, at –019 (May 17, 2018)[Ex. S]. |
| **135.** | Under ORR policy, twelve-year-old A.F.A.J. was considered "tender age" and required specialized care. | Office of Refugee Resettlement's Policy Document Regarding Unaccompanied Children, at –802 (Mar. 15, 2017) [Ex. K]. |
| **136.** | ORR officials were concerned that tender age children, like A.F.A.J., were particularly at risk for the "traumatization of separation." | Office of Refugee Resettlement's Policy Document Regarding Unaccompanied Children, at –802 (Mar. 15, 2017) [Ex. K]. |
| **137.** | While at BCFS, A.F.A.J. received the minimum services offered to children in ORR care. | Deposition of G. Alvarez-Ramos at 213:3-11 (Dec. 1, 2023) [Ex. DDDD]; 30(b)(6) Deposition of J. Gonzalez at 96:12-97:2 (Dec. 5, 2023) [Ex. FFFF]. |
| **138.** | The BCFS Case Manager assigned to A.F.A.J.'s care during her stay at BCFS testified that she | Deposition of G. Alvarez-Ramos at |

| | Uncontroverted Fact | Evidentiary Support |
|---|---|---|
| | received only two weeks of training prior to working with children. | 37:13-22 (Dec. 1, 2023) [Ex. DDDD]. |
| **139.** | Associate Deputy Director of ORR Tricia Swartz testified that HHS did not begin training staff at ORR shelters about how to recognize and address trauma in immigrant children generally, or separated immigrant children specifically, until 2019. | Deposition of T. Swartz at 22:6-24:3 (May 24, 2022) [Ex. OOO]. |
| **140.** | HHS's 30(b)(6) representative, Jose Gonzalez, testified that the trauma-informed training staff currently receives trains them to identify issues such as "a child is saying like oh, well -- and we've had this in reality -- this voice in my head keeps saying I need to kill somebody or they are about to kill me." | 30(b)(6) Deposition of J. Gonzalez at 82:13-21 (Dec. 5, 2023) [Ex. FFFF]. |
| **141.** | ORR policy states that a Case Manager's responsibilities include that "[i]f a [child] exhibits significant mental health issues, [the Case Manager] arranges for an evaluation by a licensed psychologist or psychiatrist in consultation with the CLINICIAN." | Office of Refugee Resettlement's Policy Document, "The UAC Manual of Procedures (UAC MAP), Section 1: Placement in ORR Care Provider Facilities," at – 273 (2017) [Ex. C]. |
| **142.** | ORR policy states that under the *Flores* settlement, ORR must provide "[a]ppropriate mental health interventions." | Office of Refugee Resettlement's Policy Document, "The UAC Manual of Procedures (UAC MAP), Section 3: |

| | Uncontroverted Fact | Evidentiary Support |
|---|---|---|
| | | Services," at –790 (Jan. 2019) [Ex. KK]. |
| 143. | The BCFS Case Manager assigned to A.F.A.J.'s care during her stay at BCFS testified that she was not trained to identify mental health issues. | Deposition of G. Alvarez-Ramos at 91:14-18 (Dec. 1, 2023) [Ex. DDDD]. |
| 144. | A.F.A.J. testified that she did not receive counseling or therapy at BCFS. | Deposition of Plaintiff A.F.A.J. at 45:23-46:4 (Nov. 29, 2023) [Ex. BBBB]. |
| 145. | When asked how she was feeling in the shelter, A.F.A.J., who is usually a calm and reserved child, testified she felt "anxious and desperate." | Deposition of Plaintiff A.F.A.J. at 92:18-23; 94:4-5 (Nov. 29, 2023) [Ex. BBBB]. |
| 146. | The ICS 72 Hour Preliminary Service Plan Response Form completed by BCFS indicates that A.F.A.J. "reported that she really misses her family and expressed feeling sad and worried about her current situation." | Plaintiff A.F.A.J.'s ICE 72 Hour Preliminary Service Plan Response Form, at –208 [Ex. 55]. |
| 147. | HHS's 30(b)(6) representative dismissed the statement on the ICS 72 Hour Preliminary Service Plan Response Form, testifying "[s]he's just getting there, so that's kind of a no-brainer she's going to be a little sad." | 30(b)(6) Deposition of J. Gonzalez at 82:13-21; 100:12-15 (Dec. 5, 2023) [Ex. FFFF]. |
| 148. | The Case Manager assigned to A.F.A.J.'s care testified that she could not remember if A.F.A.J. had | Deposition of G. Alvarez-Ramos at 96:11-99:3, 100:13- |

| Uncontroverted Fact | Evidentiary Support |
|---|---|
| been sad and was unable to identify whether she appeared sad in her admission photo. | 102:14 (Dec. 1, 2023) [Ex. DDDD]. |
| **149.** Counsel for Defendant in this case even suggested to A.F.A.J. in her deposition that she must have been happy at BCFS because she could play board games and sports and paint her nails. | Deposition of Plaintiff A.F.A.J. at 46:18-20; 47:7-8, 11-14 (Nov. 29, 2023) [Ex. BBBB]. |
| **150.** On May 17, 2018, the BCFS Case Manager assigned to A.F.A.J.'s care completed a "Significant Incident Report" characterizing A.F.A.J.'s separation from Mr. Arredondo as "Abuse in DHS Custody," writing "child maltreatment – Abuse & Neglect" on the final page. | Plaintiff A.F.A.J.'s Significant Incident Report at -402, 403 [Ex. 57]. |
| **151.** The "Significant Incident Report" states "[d]uring initial intake assessment with case manager, minor disclosed that she was separated from her father, Esvin Fernando Arredondo Rodriguez at the time of apprehension by Border Control." | Plaintiff A.F.A.J.'s Significant Incident Report [Ex. 57]. |
| **152.** The information in the "Significant Incident Report" was reported to numerous individuals at BCFS as well as numerous individuals at ORR. | Plaintiff A.F.A.J.'s Significant Incident Report at -402, 403 [Ex. 57]. |
| **153.** A.F.A.J. testified that when she arrived at BCFS "it was very difficult [to sleep]. . . . Because I didn't know the reason for which I was there and also because I didn't know where my mother or father were at." | Deposition of Plaintiff A.F.A.J. at 49:9-13 (Nov. 29, 2023) [Ex. BBBB]. |

| | | Uncontroverted Fact | Evidentiary Support |
|---|---|---|---|
| 154. | | Defendant's DHS 30(b)(6) witness testified that the reason for A.F.A.J.'s separation from her father could not have been explained to her because "[BCFS] staff doesn't know that [Plaintiffs] are separated . . . this is a referral.  We don't know that [Plaintiffs] are separated, again unless there is some extenuating circumstance." | 30(b)(6) Deposition of J. Gonzalez at 118:17-121:15 (Dec. 5, 2023) [Ex. FFFF]. |
| 155. | | When asked if she was able to speak with her mother during her time at BCFS, A.F.A.J. testified "[a]fter several weeks, yes." | Deposition of Plaintiff A.F.A.J. at 47:17-19 (Nov. 29, 2023) [Ex. BBBB]. |
| 156. | | On May 25, 2018, the BCFS Case Manager assigned to A.F.A.J.'s care made her first attempt to locate Mr. Arredondo so that A.F.A.J. could speak with him. | Email chain regarding scheduling a phone call between Plaintiffs (May 25, 2018) [Ex. T]. |
| 157. | | Mr. Arredondo and A.F.A.J. had one phone call during A.F.A.J.'s detention at BCFS; that call occurred on May 30, 2018. | Email requesting approval for Plaintiff A.F.A.J.'s release from ORR custody and Release Request Form [Ex. 61 and 68]. |
| 158. | | ORR policy permits children to make calls to family or friends twice a week. | 30(b)(6) Deposition of J. Gonzalez at 112:19-113:1 (Dec. 5, 2023) [Ex. FFFF]. |
| 159. | | A.F.A.J. was discharged from BCFS on June 9, 2018 at 3:35 am. | Email requesting approval for Plaintiff |

| | Uncontroverted Fact | Evidentiary Support |
|---|---|---|
| | | A.F.A.J.'s release from ORR custody and Release Request Form, at -744 [Ex. 61 and 68]. |
| 160. | The BCFS Case Manager assigned to A.F.A.J.'s care during her stay at BCFS testified that it was "normal" for a child to be discharged from the shelter at 3:35 in the morning. | Deposition of G. Alvarez-Ramos at 291:3-8 (Dec. 1, 2023) [Ex. DDDD]; 30(b)(6) Deposition of J. Gonzalez at 141:12-20 (Dec. 5, 2023) [Ex. FFFF]. |
| 161. | ORR policy requires that "[t]hirty days after release of the [child], [the Care Provider] calls the sponsor and [child] to conduct a safety and well-being follow-up call."  In that call, the Care Provider "[c]onfirms that the sponsor still resides at the address on the Verification of Release Form" and "[s]eparately speaks to both the sponsor and [child]" on topics like the child's behavior and wellbeing. | Office of Refugee Resettlement's Policy Document, "Safety and Well-Being Follow-Up Call" [Ex. A]. |
| 162. | During Mr. Arredondo's detention at the Laredo port of entry he was given a mylar blanket and no other bedding. | Plaintiff Esvin Fernando Arredondo Rodriguez's Declaration in Support of Request to be Returned to U.S. to Apply for Asylum at –331 (Dec. 6, 2018) [Ex. |

| Uncontroverted Fact | Evidentiary Support |
|---|---|
| | HH]; Deposition of Plaintiff E.F.A.R. at Tr. 78:9-13 (Nov. 30, 2023) [Ex. CCCC]. |
| 163. During Mr. Arredondo's detention at the Laredo port of entry, he was given two meals and a single, small bottle of water. | Plaintiff Esvin Fernando Arredondo Rodriguez's Declaration in Support of Request to be Returned to U.S. to Apply for Asylum at – 331 (Dec. 6, 2018) [Ex. HH] |
| 164. Mr. Arredondo and the approximately 20 other parents were forced to sleep on the cold, concrete floor. | Plaintiff Esvin Fernando Arredondo Rodriguez's Declaration in Support of Request to be Returned to U.S. to Apply for Asylum at – 331 (Dec. 6, 2018) [Ex. HH]. |
| 165. Mr. Arredondo and the approximately 20 other parents were not given regular access to the restroom.   Mr. Arredondo observed one woman repeatedly asking to use a restroom, but officers did not respond causing the woman to soil herself. | Plaintiff Esvin Fernando Arredondo Rodriguez's Declaration in Support of Request to be Returned to U.S. to Apply for Asylum at – |

| | **Uncontroverted Fact** | **Evidentiary Support** |
|---|---|---|
| | | 331 (Dec. 6, 2018) [Ex. HH]. |
| **166.** | On May 18, 2018, Mr. Arredondo was transported by van to the Rio Grande Detention Center, in Laredo, Texas ("Rio Grande") in handcuffs, waist chains, and leg chains. | Pl. E.F.A.R.'s Rs & Os to Defendant's Interrog. 6 (Oct. 23, 2023) [Ex. WWW]; Deposition of Plaintiff E.F.A.R. 80:19-25 (Nov. 30, 2023) [Ex. CCCC]. |
| **167.** | Mr. Arredondo was detained at Rio Grande for approximately three weeks, beginning from May 18, 2018 to June 4, 2018. | Pl. E.F.A.R.'s Rs & Os to Defendant's Interrog. 6 (Oct. 23, 2023) [Ex. WWW]; 30(b)(6) Deposition of M. Burke at 45:22-46:5 (Dec. 7, 2023) [Ex. GGGG]. |
| **168.** | ICE's representative testified that Rio Grande is a privately ran detention center contracted with the United States Marshals Service ("USMS"). | 30(b)(6) Deposition of M. Burke at 48:20-49:1 (Dec. 7, 2023) [Ex. GGGG]. |
| **169.** | ICE's representative further testified that the Rio Grande detention center is used by Enforcement and Removal Operations ("ERO") to house noncitizens who had been placed into immigration proceedings or who had final orders of removal, while USMS used the facility for pretrial inmates to ensure their appearance for their court proceedings. | 30(b)(6) Deposition of M. Burke at 58:1-6 (Dec. 7, 2023) [Ex. GGGG]. |

| | Uncontroverted Fact | Evidentiary Support |
|---|---|---|
| **170.** | Mr. Arredondo described the initial holding cell at Rio Grande as an "icebox" because of its cold temperature. | Deposition of Plaintiff E.F.A.R. at 84:21 (Nov. 30, 2023) [Ex. CCCC]. |
| **171.** | At Rio Grande, Mr. Arredondo was kept in an overcrowded room with 25 to 30 other individuals who slept on bunks just three feet apart. | Pl. E.F.A.R.'s Rs & Os to Defendant's Interrog. 6 (Oct. 23, 2023) [Ex. WWW]; Deposition of Plaintiff E.F.A.R. at 86:19-24 (Nov. 30, 2023) [Ex. CCCC]. |
| **172.** | Mr. Arredondo testified that he felt anxious and nervous during his time at Rio Grande. | Deposition of Plaintiff E.F.A.R. at 90:10-19, 107:3-5 (Nov. 30, 2023) [Ex CCCC]. |
| **173.** | During his detention at Rio Grande, Mr. Arredondo was given no information about the process to apply for asylum. | Pl. E.F.A.R.'s Rs & Os to Defendant's Interrog. 6 (Oct. 23, 2023) [Ex. WWW]. |
| **174.** | During his detention at Rio Grande, Mr. Arredondo repeatedly asked for information about A.F.A.J. without answer.  Eventually he was told she was in a facility in San Antonio. | Plaintiff Esvin Fernando Arredondo Rodriguez's Declaration in Support of Request to be Returned to U.S. to Apply for Asylum at – 332 (Dec. 6, 2018) [Ex. HH]. |

| | | Uncontroverted Fact | Evidentiary Support |
|---|---|---|---|
| 175. | | Mr. Arredondo testified that when he eventually spoke with A.F.A.J. "[w]e were not able to talk for long.  Mainly, I was asking her how she was feeling and where she was at.  I was able to find out that she was at a children's center in San Antonio.  I asked if she had been able to speak to her mother, if she knew anything about her mother. . . .  That she was very sad.  Andrea -- that time, I -- I was able to try to motivate her.  I was able to tell her that everything was going to be okay and that we would soon be together.  She was very sad." | Deposition of Plaintiff E.F.A.R. at 100:2-101:1 (Nov. 30, 2023) [Ex. CCCC]. |
| 176. | | On June 4, 2018, Mr. Arredondo was transported by van and plane to the Stewart Detention Center in Lumpkin, Georgia ("Stewart"). | Pl. E.F.A.R.'s Rs & Os to Defendant's Interrog. 7 (Oct. 23, 2023) [Ex. WWW]; Deposition of Plaintiff E.F.A.R. at 92:04-07 (Nov. 30, 2023) [Ex. CCCC]; 30(b)(6) Deposition of M. Burke at 93:4-7 (December 7, 2023) [Ex. GGGG]. |
| 177. | | Mr. Arredondo was transported to Stewart in handcuffs, waist chains, and leg chains. | Deposition of Plaintiff E.F.A.R. at 91:14-92:-21 (Nov. 30, 2023) [Ex. CCCC]; 30(b)(6) Deposition of M. Burke |

| | Uncontroverted Fact | Evidentiary Support |
|---|---|---|
| | | 94:8-18 (December 7, 2023) [Ex. GGGG]. |
| **178.** | During his trip from Rio Grande to Stewart, Mr. Arredondo was given a bag with a sandwich and a bottle of water but was unable to open and drink it due to the handcuffs and chains. | Deposition of Plaintiff E.F.A.R. at 91:14-92:-21(Nov. 30, 2023)  [Ex. CCCC]. |
| **179.** | Mr. Arredondo described the initial holding cell at Stewart as an "icebox" because of its cold temperature. | Deposition of Plaintiff E.F.A.R. at 102:10-11, 103:4-8 (Nov. 30, 2023) [Ex. CCCC]. |
| **180.** | Mr. Arredondo testified that his first night in Stewart was sleeping on the floor in a cold room with "50 or -- or 70" other detainees. | Deposition of Plaintiff E.F.A.R. at 102:6-25 (Nov. 30, 2023) [Ex. CCCC]. |
| **181.** | At Stewart, Mr. Arredondo was kept in an overcrowded room with 25 to 30 other individuals who slept on bunks just three feet apart. | Pl. E.F.A.R.'s Rs & Os to Defendant's Interrog. 7 (Oct. 23, 2023) [Ex. WWW]; Deposition of Plaintiff E.F.A.R. at 103:20-104:3 (Nov. 30, 2023) [Ex. CCCC]. |
| **182.** | The guards at Stewart used aggressive force and verbally abused Mr. Arredondo. | Pl. E.F.A.R.'s Rs & Os to Defendant's Interrog. 7 (Oct. 23, 2023) [Ex. WWW]. |

| | | Uncontroverted Fact | Evidentiary Support |
|---|---|---|---|
| | **183.** | Mr. Arredondo testified that because of his nerves and anxiety "[o]nce I was a[t] Stewart, I couldn't sleep at night.  I had allergies.  I had headaches." | Deposition of Plaintiff E.F.A.R. at 105:8-9; 108:17-109:17 (Nov. 30, 2023) [Ex. CCCC]; Plaintiff Esvin Fernando Arredondo Rodriguez's Declaration in Support of Request to be Returned to U.S. to Apply for Asylum at -332 (Dec. 6, 2018) [Ex. HH]. |
| | **184.** | Mr. Arredondo also testified that his anxiety and nerves cause his hair to fall off while at Stewart. | Deposition of Plaintiff E.F.A.R. at 107:6-10 (Nov. 30, 2023) [Ex. CCCC]; Plaintiff Esvin Fernando Arredondo Rodriguez's Declaration in Support of Request to be Returned to U.S. to Apply for Asylum at – 332 (Dec. 6, 2018) [Ex. HH]. |
| | **185.** | Mr. Arredondo also testified that he suffered from depression during his detention at Stewart. | Deposition of Plaintiff E.F.A.R. at 108:17-109:17 (Nov. 30, 2023) [Ex. CCCC]. |

| | | Uncontroverted Fact | Evidentiary Support |
|---|---|---|---|
| | **186.** | Mr. Arredondo "did not affirmatively seek medical attention because he observed guards isolating detainees who sought medical attention—for as long as 40 days." | Pl. E.F.A.R.'s Rs & Os to Defendant's Interrog. 9 (Oct. 23, 2023) [Ex. WWW]; Deposition of Plaintiff E.F.A.R. at 105:25-106-12 (Nov. 30, 2023) [Ex. CCCC]; Plaintiff Esvin Fernando Arredondo Rodriguez's Declaration in Support of Request to be Returned to U.S. to Apply for Asylum at -332 (Dec. 6, 2018) [Ex. HH]. |
| | **187.** | On June 27, 2023 DHS OIG published a report titled "Results of an Unannounced Inspection of ICE's Stewart Detention Center in Lumpkin, Georgia." | Office of Inspector General Report, "Results of an Unannounced Inspection of ICE's Stewart Detention Center in Lumpkin, Georgia" (Jul. 27, 2023) [Ex. VVV]. |
| | **188.** | In their report DHS OIG stated that detention centers are required "to have a sick call procedure that allows detainees the unrestricted opportunity to | Office of Inspector General Report, "Results of an |

| Uncontroverted Fact | Evidentiary Support |
|---|---|
| freely request health care services (including dental and mental health services) provided by a physician or other qualified medical staff in a clinical setting. Our medical contractors determined this was not occurring at Stewart and found that the sick call system at Stewart was not functioning properly. . . . facility staff took no proactive action to ensure the medical unit received sick call requests in a timely manner." | Unannounced Inspection of ICE's Stewart Detention Center in Lumpkin, Georgia" at 17-18 (Jul. 27, 2023) [Ex. VVV]. |
| **189.** DHS OIG further reported that "[s]tandards also require facilities to maintain a permanent record of all sick call requests.  Stewart did not maintain a log of sick call requests, making it impossible to properly track and ensure completion of the requests.  Detainees we interviewed reported difficulties in obtaining sick call services, and our medical experts found corroborating evidence in medical records.  A random review of electronic sick call requests showed that detainees were only seen 50 percent of the time." | Office of Inspector General Report, "Results of an Unannounced Inspection of ICE's Stewart Detention Center in Lumpkin, Georgia" at 18 (Jul. 27, 2023) [Ex. VVV]*; see also* 30(b)(6) Deposition of M. Burke at 76:20-77:1 (Dec. 7, 2023) [Ex. GGGG]. |
| **190.** DHS OIG found that "Stewart did not provide meaningful access for detainees with limited English proficiency to submit grievances electronically, as parts of the grievance submission menu were only available in English.  Also, staff | Office of Inspector General Report, "Results of an Unannounced Inspection of ICE's |

| | Uncontroverted Fact | Evidentiary Support |
|---|---|---|
| | infrequently responded to grievances in a language detainees could understand and did not use the 'translate to' feature available to them in the electronic grievance system." | Stewart Detention Center in Lumpkin, Georgia" at 9 (Jul. 27, 2023) [Ex. VVV]. |
| 191. | DHS OIG found that only 12 percent of medical grievances submitted electronically by detainees were responded to. | Office of Inspector General Report, "Results of an Unannounced Inspection of ICE's Stewart Detention Center in Lumpkin, Georgia" at 10 (Jul. 27, 2023) [Ex. VVV]. |
| 192. | On June 15, 2018, Mr. Arredondo was transported by bus from Stewart to the Folkston Immigration Processing Center in Folkston, Georgia ("Folkston"). | Pl. E.F.A.R.'s Rs & Os to Defendant's Interrog. 8 (Oct. 23, 2023) [Ex. WWW]; Deposition of Plaintiff E.F.A.R. at 110:8-12 (Nov. 30, 2023) [Ex. CCCC]; 30(b)(6) Deposition of M. Burke at 130:10-17 (December 7, 2023) [Ex. GGGG]. |
| 193. | During his trip from Stewart to Folkston, Mr. Arredondo was restrained by handcuffs, leg restraints, and a waist chain. | 30(b)(6) Deposition of M. Burke at 133:21- |

| | Uncontroverted Fact | Evidentiary Support |
|---|---|---|
| | | 134:3 (Dec. 7, 2023) [Ex. GGGG]. |
| 194. | Mr. Arredondo testified that it took the transport to Folkston took "six or seven hours" during which the detainees had no access to a restroom and no food or water. | Deposition of Plaintiff E.F.A.R. at 110:13-111:3 (Nov. 30, 2023) [Ex. CCCC]. |
| 195. | ICE's representative testified for trips longer than six hours, detainees are to be provided food. | 30(b)(6) Deposition of M. Burke at 132:17-24 (Dec. 7, 2023) [Ex. GGGG]. |
| 196. | At the Folkston detention center, Mr. Arredondo was kept in an overcrowded room with 25 to 30 other individuals who slept on bunks just three feet apart. | Pl. E.F.A.R.'s Rs & Os to Defendant's Interrog. 8 (Oct. 23, 2023) [Ex. WWW]. |
| 197. | Mr. Arredondo testified that at Folkston and Stewart he was not given any information about the reason for his transfer. | Deposition of Plaintiff E.F.A.R. at 111:19-22 (Nov. 30, 2023) [Ex. CCCC]. |
| 198. | Mr. Arredondo testified that the physical symptoms of his nerves, anxiety, and depression continued while he was at "Stewart, Folkston, every place." | Deposition of Plaintiff E.F.A.R. at 119:14-22 (Nov. 30, 2023) [Ex. CCCC]. |
| 199. | ICE's representative testified that staff at the housing units of Folkston IPC are responsible for observing if detainees are struggling with physical illness or mental health issues, and would be required to alert medical staff. | 30(b)(6) Deposition of at M. Burke 143:3-11 (Dec. 7, 2023) [Ex. GGGG]. |

| | | Uncontroverted Fact | Evidentiary Support |
|---|---|---|---|
| | **200.** | Mr. Arredondo testified that "more than a month" after he and A.F.A.J. were separated he learned that A.F.A.J. had been released to her mother, Mr. Arredondo's wife. | Deposition of Plaintiff E.F.A.R. at 118:18-25 (Nov. 30, 2023) [Ex. CCCC]. |
| | **201.** | When Mr. Arredondo was finally administered a Credible Fear Interview ("<u>CFI</u>") over the telephone, "he found himself unable to follow the questions that were being asked and was ignored when he asked that the questions be repeated.  He felt that the interviewer was remote, was rushing him, was unwilling to allow him the time to explain what had happened in Guatemala.  He felt confused and ill.  He felt ashamed at his inability to follow the questions, to get himself heard, to get his story told." | Psychological Evaluation of Esvin Fernando Arredondo Rodriguez at -028 [Ex. HHH]; Plaintiff Esvin Fernando Arredondo Rodriguez's Declaration in Support of Request to be Returned to U.S. to Apply for Asylum at -333 (Jun. 13, 2020)[Ex. HH]. |
| | **202.** | Mr. Arredondo's Credible Fear Determination Checklist establishes that he testified that he experienced past harm in his home country and that he fears future harm if returned to his home country; the testimony was found credible. | Plaintiff Esvin Fernando Arredondo Rodriguez's A-file, at –875 [Ex. 29]; Deposition of Plaintiff E.F.A.R. at 125:21-126:7 (Nov. 30, 2023) [Ex. CCCC]. |
| | **203.** | While detained at Folkston, Mr. Arredondo spoke with an ICE agent who informed Mr. Arredondo Rodriguez that the United States "[was] not | Pl. E.F.A.R.'s Rs & Os to Defendant's Interrog. 11 (Oct. 23, 2023) [Ex. |

| | Uncontroverted Fact | Evidentiary Support |
|---|---|---|
| | interested in accepting like [him]" and that people like him can never get asylum in the United States. | WWW]; Pl. E.F.A.R.'s Rs & Os to Defendant's Interrog. 12 (Oct. 23, 2023) [Ex. WWW]; Pl. E.F.A.R.'s Rs & Os to Defendant's Interrog. 13 (Oct. 23, 2023) [Ex. WWW]; Deposition of Plaintiff E.F.A.R. at 130:18-23 (Nov. 30, 2023) [Ex. CCCC]; Plaintiff Esvin Fernando Arredondo Rodriguez's A-file, at – 907 [Ex. 29]; |
| 204. | Mr. Arredondo testified that an agent called him, informing him that he did not pass his credible fear interview, but he could not recall whether the agent told him that he "could request review of the decision by an immigration judge." | Deposition of Plaintiff E.F.A.R. at 132:14-20 (Nov. 30, 2023) [Ex. CCCC]. |
| 205. | Mr. Arredondo testified that an ICE agent told him that if he requested a decision from an immigration judge, the "judge would be focused mainly on ICE's decision" and he "was going to get deported anyway." | Deposition of Plaintiff E.F.A.R.  at 135:11-25 (Nov. 30, 2023) [Ex. CCCC]; Psychological Evaluation of Esvin Fernando Arredondo Rodriguez, conducted |

| | Uncontroverted Fact | Evidentiary Support |
|---|---|---|
| | | by Amy J. Cohen, MD, dated June 13, 2020, at -028 [Ex. HHH]; True and correct copy of Plaintiff Esvin Fernando Arredondo Rodriguez's Declaration in Support of Request to be Returned to U.S. to Apply for Asylum, at -333-334 (Dec. 6, 2018) [Ex. HH]. |
| 206. | Mr. Arredondo testified that he signed the Record of Negative Credible Fear Finding, a form presented to him in English, because he felt pressured to sign it by the ICE agent. | Deposition of Plaintiff E.F.A.R. at 133:11-19, 134:20-135:10 (Nov. 30, 2023) [Ex. CCCC]; Plaintiff Esvin Fernando Arredondo Rodriguez's A-file, at – USA000907 [Ex. 29]. |
| 207. | Mr. Arredondo testified that no one read, translated, or explained the Record of Negative Credible Fear Finding form to him, and he did not check the boxes on the form. | Deposition of Plaintiff E.F.A.R. at 137:3-138:1 (Nov. 30, 2023) [Ex. CCCC]. |
| 208. | On June 28, 2018, Mr. Arredondo was transported by bus back to Stewart from Folkston in handcuffs, waist chains, and leg chains. | Plaintiff Esvin Fernando Arredondo Rodriguez's Rs & Os to |

| Uncontroverted Fact | Evidentiary Support |
|---|---|
| | Defendant's Interrog. 7 (Oct. 23, 2023) [Ex. WWW]; Deposition of Plaintiff E.F.A.R. at 140:11-19 (Nov. 30, 2023) [Ex. CCCC]; 30(b)(6) Deposition of M. Burke at 163:7-166:24 (Dec. 7, 2023) [Ex. GGGG]. |
| **209.** At one point, Mr. Arredondo had marks on his arms and legs that lasted for eight days, which were caused by the restraints used on him during his transfers between facilities. | Plaintiff Esvin Fernando Arredondo Rodriguez's Declaration in Support of Request to be Returned to U.S. to Apply for Asylum at ¶ 10 (Dec. 6, 2018) [Ex. HH]. |
| **210.** Mr. Arredondo testified that for the six to seven hours it took to transport the detainees back to Stewart "[t]he ones that were in charge of the bus didn't stop anyplace.  Even though you told them that you might have to urinate, they wouldn't stop the bus." | Deposition of Plaintiff E.F.A.R. at 140:25-141:6 (Nov. 30, 2023) [Ex. CCCC]. |
| **211.** Mr. Arredondo was in custody at Stewart for a second time from June 28, 2018 to August 22, 2018. | 30(b)(6) Deposition of M. Burke 47:14-17 |

| | Uncontroverted Fact | Evidentiary Support |
|---|---|---|
| | | (Dec. 7, 2023) [Ex. GGGG]. |
| **212.** | Mr. Arredondo testified that at Rio Grande, Stewart, and Folkston he was not given a pillow, "[j]ust a blanket so that you can cover yourself, and there is also a sheet over the mattress." | Deposition of Plaintiff E.F.A.R. at 115:6-12 (Nov. 30, 2023) [Ex. CCCC]. |
| **213.** | Mr. Arredondo testified that throughout his detention his requests to contact his family were denied. | Deposition of Plaintiff E.F.A.R. at 108:20-109:7 (Nov. 30, 2023) [Ex. CCCC]. |
| **214.** | Mr. Arredondo was never referred for prosecution. | Transcript of Telephonic Status Conference at 18:25-19:3 (Nov. 21, 2023) [Ex. AAAA]. |
| **215.** | On August 22, 2018, Mr. Arredondo was deported from the United States. | 30(b)(6) Deposition of M. Burke 166:25-167:3 (Dec. 7, 2023) [Ex. GGGG]; Form I-862, Notice to Appear for Plaintiff A.F.A.J., dated May 16, 2018 [Ex. R]. |
| **216.** | Defendant's Rule 30(b)(6) testified that deporting Mr. Arredondo did not violate Judge Sabraw's June 26, 2018 preliminary injunction. | 30(b)(6) Deposition of M. Burke 194:15-17 (Dec. 7, 2023) [Ex. GGGG]. |

| | Uncontroverted Fact | Evidentiary Support |
|---|---|---|
| **217.** | ████████████████████ ████████████████████ ██████████████████████ ████████████████████ ██████████████████████ ██████████████████████ ███████████████████ ████████████████████ ████████████████████ █████████████████████ █████████████████████ ███████████████████ █████████████████████ ████████████████████ ██████████████████████ ██████████████████████ ██████████████████ ███████████████ | Psychological Evaluation of Esvin Fernando Arredondo Rodriguez, conducted by Amy J. Cohen, MD at –029 (Jun. 13, 2020) [Ex. HHH]. |
| **218.** | On September 12, 2018, the Government and the ACLU filed a settlement agreement of certain issues in the *Ms. L.* Action (the "<u>*Ms. L.* Settlement Agreement</u>"). | Order Certifying Settlement Classes and Granting Final Approval of Class Action Settlement, *Ms. L. v. U.S. Immigr. & Customs Enf't*, No. 18-0428, (S.D. Cal. Nov. 15, 2018), ECF No. 321 [Ex. QQ]. |

| | | Uncontroverted Fact | Evidentiary Support |
|---|---|---|---|
| 219. | | On November 15, 2018, Judge Sabraw entered an Order approving the *Ms. L.* Settlement Agreement. | Order Certifying Settlement Classes and Granting Final Approval of Class Action Settlement, *Ms. L. v. U.S. Immigr. & Customs Enf't*, No. 18-0428, (S.D. Cal. Nov. 15, 2018), ECF No. 321 [Ex. QQ]. |
| 220. | | The *Ms. L.* Settlement Agreement provided that "Plaintiffs' counsel may raise with the government individual cases in which plaintiffs' counsel believes the return of a particular removed *Ms. L* class member may be warranted. Plaintiffs' counsel represent that they believe that such individual cases will be rare and unusual and that they have no basis for believing that such individual cases will be other than rare and unusual." | Plaintiff's Notice of Motion and Motion for Final Approval of Class Action Settlement, *Ms. L. v. U.S. Immigr. & Customs Enf't*, No. 18-0428, (S.D. Cal. Nov. 9, 2018), ECF No. 315-2 [Ex. PP]. |
| 221. | | Through the ACLU as plaintiffs' counsel, Mr. Arredondo sought to be considered for return under the *Ms. L* settlement agreement and provided sworn written testimony about what had been done to him. | Plaintiff Esvin Fernando Arredondo Rodriguez's Request for Reconsideration of Removed Parent under Settlement Agreement (Dec. 7, 2018) [Ex. II]. |

| | | Uncontroverted Fact | Evidentiary Support |
|---|---|---|---|
| | 222. | In response, the Government advised that although Mr. Arredondo was in ICE custody at the time of the Preliminary Injunction, Mr. Arredondo's daughter, A.F.A.J. had been released from custody the day before and the Government therefore did not consider Mr. Arredondo and A.F.A.J. to have been separated under the Family Separation Policy or ZTP, and were ineligible for return under the Ms. L settlement agreement. | Deposition of L. Dakin-Grimm at 36:23-37:6 (Dec. 4, 2023) [Ex. EEEE]; Defendants' Opposition to Plaintiffs' Motion to Clarify the Scope of the *Ms. L Class*, *Ms. L. v. U.S. Immigr. & Customs Enf't*, No. 18-0428, (S.D. Cal. Feb. 6, 2019), ECF No. 351 ("For these reasons, parents whose children were released from ORR custody prior to June 26, 2018 are in a different legal position from that of existing class members.") [Ex. RR]; Dakin-Grimm Decl. ¶ 5. |
| | 223. | In the *Ms. L.* Action, Judge Sabraw rejected the Government's position and ordered that the timing of a child's release from custody was not the basis for a determination that the family was not separated. | Order Granting Plaintiffs' Motion to Modify Class Definition, *Ms. L. v. U.S. Immigr. &* |

| | **Uncontroverted Fact** | **Evidentiary Support** |
|---|---|---|
| | | *Customs Enf't*, No. 18-0428 (S.D. Cal. Mar. 9, 2019), ECF. No. 386 [Ex. SS]. |
| 224. | The Government conceded that Plaintiffs were a separated family but rejected Mr. Arredondo's request to be permitted to return as a "rare and unusual case," along with every single other such application by a deported parent. | Email from Sarah Fabian, Counsel for Defendants, to Counsel for Plaintiffs, "Response to Class Member Requests for Return Under the Settlement Agreement," dated February 20, 2019, Ex. 2 to Declaration of Daniel Galindo in Support of Plaintiffs' Motion to Allow Parents Deported Without Their Children to Travel to the United States, *Ms. L v. U.S. Immigr. Customs & Enf't*, No. 18-cv-428 (S.D. Cal. June 6, 2019) ECF No. 418-4 [Ex. UU]; Defendant's Opposition to Plaintiffs' |

| | Uncontroverted Fact | Evidentiary Support |
|---|---|---|
| | | Motion to Allow Parents Deported Without Their Children to Travel to the United States, *Ms. L v. U.S. Immigr. & Customs Enf't*, No. 18-cv-428, at 10-11 (S.D. Cal. June 28, 2019), ECF No. 428 [Ex. VV]; Dakin-Grimm Decl. ¶ 7. |
| 225. | On June 6, 2019, the ACLU moved the Court to order the Government to permit the return of 21 parents including Mr. Arredondo, which the Government opposed. | Motion to Allow Parents Deported Without Their Children to Travel to the United States, *Ms. L v. U.S. Immigr. & Customs Enf't*, No. 18-cv-428, at 1 (S.D. Cal. June 6, 2019), ECF No. 418-1 [Ex. TT]; *see also Ms. L. v. U.S. Immigr. & Customs Enf't*, 403 F. Supp. 3d 853, 863 (S.D. Cal. 2019) [Ex. XX]. |
| 226. | On July 29, 2019, Judge Sabraw ordered the government to "produce to Plaintiffs any and all | Order Requesting Supplemental Briefing, |

| Uncontroverted Fact | Evidentiary Support |
|---|---|
| evidence relevant to the issues set out above," including the "legal basis for the deportation of the 21 parents." | *Ms. L. v. U.S. Immigr. & Customs Enf't*, No. 18-cv-0428 (S.D. Cal. July 29, 2019), ECF No. 437 [Ex. WW]. |
| **227.** With respect to Mr. Arredondo, the Government produced only two documents to support the legal basis for his deportation. | Dakin-Grimm Decl. ¶ 10. |
| **228.** On September 4, 2019, Judge Sabraw ordered that Mr. Arredondo, an existing member of the *Ms. L.* class, along with other parents deported in violation of Judge Sabraw's June 26, 2018 order (*i.e.*, the Preliminary Injunction), be permitted reentry to the United States for purposes of pursuing asylum. | *Ms. L. v. U.S. Immigr. & Customs Enf't*, 403 F. Supp. 3d 853, 863 (S.D. Cal. 2019) [Ex. XX]. |
| **229.** Judge Sabraw's September 4, 2019, order identifies Mr. Arredondo by his initials, "E.F.A.R." | Deposition of L. Dakin-Grimm 43:14-25 (Dec. 4, 2023) [Ex. EEEE]. |
| **230.** At the time the September 4, 2019 order was issued, the Government acknowledged that Mr. Arredondo was in fact a member of the *Ms. L.* class.  Judge Sabraw's order states, in part, "[t]here is no dispute the eighteen parents at issue fall within the *Ms. L.* Class." | *Ms. L. v. U.S. Immigr. & Customs Enf't*, 403 F. Supp. 3d 853, 857 (S.D. Cal. 2019) [Ex. XX]. |
| **231.** Judge Sabraw found that Mr. Arredondo, along the other class members that were the subject of the order, had been "separated from their children at the border pursuant to a nationwide policy." | *Ms. L. v. U.S. Immigr. & Customs Enf't*, 403 F. Supp. 3d 853, 860 (S.D. Cal. 2019) [Ex. XX]. |

| | | Uncontroverted Fact | Evidentiary Support |
|---|---|---|---|
| | **232.** | Judge Sabraw further found that Mr. Arredondo "was removed not only after the Court's stay order, but after the Court issued a temporary restraining order prohibiting Defendants from removing Class Members.  Accordingly, the removal[] of [Mr. Arredondo was] also unlawful." | *Ms. L. v. U.S. Immigr. & Customs Enf't*, 403 F. Supp. 3d 853, 863 (S.D. Cal. 2019) [Ex. XX]. |
| | **233.** | Judge Sabraw also found that each plaintiff parent, including Mr. Arredondo had suffered injury, "namely separation from their child." | *Ms. L. v. U.S. Immigr. & Customs Enf't*, 403 F. Supp. 3d 853, 858 (S.D. Cal. 2019) [Ex. XX]. |
| | **234.** | On January 17, 2020, Patrick D. McKenna, Unit Chief, PLEPU at ICE in Washington, D.C. issued a letter purporting to grant Mr. Arredondo "humanitarian parole for a period of three (3) days from the date of entry." | Plaintiff Esvin Fernando Arredondo Rodriguez's Objection and Response to Notice to Appear and Government's "Evidence of Removability," at –154 (Apr. 14, 2020) [Ex. FFF]. |
| | **235.** | McKenna's letter does not acknowledge the existence of Judge Sabraw's order. | Plaintiff Esvin Fernando Arredondo Rodriguez's Objection and Response to Notice to Appear and Government's "Evidence of |

| | Uncontroverted Fact | Evidentiary Support |
|---|---|---|
| | | Removability," at –154 (Apr. 14, 2020) [Ex. FFF]. |
| 236. | Mr. Arredondo was directed to present McKenna's letter along with a picture ID, at the U.S. Embassy in Guatemala City, Guatemala, within thirty days to obtain travel documents allowing him to enter the United States. | Plaintiff Esvin Fernando Arredondo Rodriguez's Objection and Response to Notice to Appear and Government's "Evidence of Removability," at –154 (Apr. 14, 2020) [Ex. FFF]; Deposition of L. Dakin-Grimm at 47:5-17 (Dec. 4, 2023) [Ex. EEEE]. |
| 237. | Mr. Arredondo did as instructed on January 21, 2020; he was confronted by the Guatemalan National Police upon arrival at the Embassy, and the Embassy denied knowledge of the situation directing Mr. Arredondo to leave the embassy premises. | Plaintiff Esvin Fernando Arredondo Rodriguez's Objection and Response to Notice to Appear and Government's "Evidence of Removability," at -110 (Apr. 14, 2020) [Ex. FFF]; Deposition of L. Dakin-Grimm at 53:11- |

| | Uncontroverted Fact | Evidentiary Support |
|---|---|---|
| | | 54:22, 55:15-23 (Dec. 4, 2023) [Ex. EEEE]. |
| **238.** | After intervention by members of Congress in the United States, Mr. Arredondo was directed to go to an office building elsewhere in Guatemala City where ICE personnel issued travel documents to present to Guatemalan officials and to U.S. Customs and Border Protection upon arrival in Los Angeles. | Deposition of L. Dakin-Grimm at 53:11-54:22, 55:15-23, 56:5-20 (Dec. 4, 2023) [Ex. EEEE]; *see also* Email from Gail K. Fraser (U.S. Immigration and Customs Enforcement) to Linda Dakin-Grimm regarding Guatemalan Embassy (Jan. 21, 2020) [Ex. AAA]. |
| **239.** | On January 22, 2020, Mr. Arredondo arrived in the United States in January of 2020—more than 20 months after he and A.F.A.J. were forcibly separated at Laredo. | Plaintiff Esvin Fernando Arredondo Rodriguez's Authorization for Parole of an Alien into the United States Form (Jan. 25, 2020) [Ex. DDD]; Plaintiff Esvin Fernando Arredondo Rodriguez's Objection and Response to Notice to Appear and Government's |

| | Uncontroverted Fact | Evidentiary Support |
|---|---|---|
| | | "Evidence of Removability," at –110 (Apr. 14, 2020) [Ex. FFF]; *see also* Angelus News article, "Church-led effort leads to separated immigrant family's LAX reunion," (Jan. 24, 2020) [Ex. CCC]; Los Angeles Times article, "Families reunite after nearly two years apart: 'Beginning of a whole other journey,'" (Jan. 23, 2020) [Ex. BBB]. |
| 240. | McKenna's letter instructed Mr. Arredondo to report to in person to Victor L. Daniels at the ICE/ERO in San Diego within 72 hours of arrival in the United States. | Plaintiff Esvin Fernando Arredondo Rodriguez's Objection and Response to Notice to Appear and Government's "Evidence of Removability," at –154, -156 (Apr. 14, 2020) [Ex. FFF]; Deposition of L. Dakin-Grimm |

| Uncontroverted Fact | Evidentiary Support |
|---|---|
| | 58:16-21 (Dec. 4, 2023) [Ex. EEEE]. |
| **241.** Mr. Arredondo's counsel repeatedly attempted to contact the officer referred to in McKenna's letter and received no response. | Plaintiff Esvin Fernando Arredondo Rodriguez's Objection and Response to Notice to Appear and Government's "Evidence of Removability," at –110 (Apr. 14, 2020) [Ex. FFF]; Deposition of L. Dakin-Grimm 59:1-17 (Dec. 4, 2023) [Ex. EEEE]. |
| **242.** Mr. Arredondo was eventually directed to report to the Los Angeles ICE/ERO office within 72 hours of arrival in the United States, which he did. | Plaintiff Esvin Fernando Arredondo Rodriguez's Objection and Response to Notice to Appear and Government's "Evidence of Removability," at –110 (Apr. 14, 2020) [Ex. FFF]; Deposition of L. Dakin-Grimm at 59:1- |

| | Uncontroverted Fact | Evidentiary Support |
|---|---|---|
| | | 17 (Dec. 4, 2023) [Ex. EEEE]. |
| **243.** | At the Los Angeles ICE/ERO office Mr. Arredondo was served with a U.S. Department of Homeland Security "Warrant for Arrest of Alien," dated January 24, 2020. | Plaintiff Esvin Fernando Arredondo Rodriguez's Objection and Response to Notice to Appear and Government's "Evidence of Removability," at –156 (Apr. 14, 2020) [Ex. FFF]. |
| **244.** | On January 28, 2022, DHS notified Mr. Arredondo's counsel that he and A.F.A.J. "ha[d] been found **qualified** for Family Reunification Task Force (Task Force) services," including parole-in-place. | Plaintiffs Esvin Fernando Arredondo Rodriguez and A.F.A.J.'s I-131 Parole in Place Applications to Family Reunification Task Force for Separated Individuals and Immediate Family Members, at –395 (Jan. 28, 2022) (emphasis in original) [Ex. MMM]. |
| **245.** | The Task Force was established by the Biden Administration to "address the human tragedy of the zero-tolerance policy." | U.S. Senator Dick Durbin of Illinois's Press Release, "Durbin, |

| Uncontroverted Fact | Evidentiary Support |
|---|---|
| | Leahy, Padilla, Merkley, Colleagues Encourage Biden Administration's Efforts to Provide a Just Resolution for Families Separated Under the Former President's Cruel 'Zero-Tolerance' Policy," (March 16, 2022) [Ex. KKK]; *see also* Executive Order 14011 (Feb. 2, 2021) [Ex. JJJ]. |
| **246.** ███████████ ████████████ ████ | Immigration Judge's Order Granting Plaintiffs Esvin Fernando Arredondo Rodriguez and A.F.A.J.'s Asylum Applications, at –805 (Dec. 5, 2022) [Ex. GGG]. |
| **247.** ██████████ ███████████ ██████████ | Plaintiff A.F.A.J.'s Psychological Evaluation, at –646 |

| | Uncontroverted Fact | Evidentiary Support |
|---|---|---|
| | | (Jun. 2, 2020) [Ex. GGG]. |
| 248. | ████████████████ ████████████████ ██████████████ ████████████████ █████████████████ ███████████████ ████████████ | Plaintiff A.F.A.J.'s Psychological Evaluation, at –646 (Jun. 2, 2020) [Ex. GGG]. |
| 249. | A.F.A.J. testified that she thinks about the separation "almost everyday" and has recurring bad memories. | Deposition of Plaintiff A.F.A.J. at 95:20-96:13 (Nov. 29, 2023) [Ex. BBBB]. |
| 250. | A.F.A.J. testified that she continues to experience headaches triggered by "thoughts of the separation and [her] brother." | Deposition of Plaintiff A.F.A.J. at 97:1-98:1 (Nov. 29, 2023) [Ex. BBBB]. |
| 251. | A.F.A.J. has undergone weekly therapy sessions since July 2022 to treat her injuries. | Plaintiff A.F.A.J.'s Reponses and Objections to Defendant U.S.A.'s Rs & Os to Defendant's Interrog. (Set One), at 4 (Nov. 9, 2023) [Ex. XXX]. |
| 252. | ███████████████ █████████████████ █████████████████ ██████ | Psychological Evaluation of Esvin Fernando Arredondo Rodriguez, conducted |

| Uncontroverted Fact | Evidentiary Support |
|---|---|
| | by Amy J. Cohen, MD, at –032 (Jun. 13, 2020) [Ex. HHH]. |
| 253. ██████████████ ████████████████ ████████████ █████████ █████████ ██████████████ █████████████ ████████████ ██████████████ ███████ █████████████ █████████████ █████████████ ████████████ █████████ █████████ ██████████████ ████████ | Psychological Evaluation of Esvin Fernando Arredondo Rodriquez, conducted by Amy J. Cohen, MD, at –032-033 (Jun. 13, 2020) [Ex. HHH]. |