E. MARTIN ESTRADA
United States Attorney
DAVID M. HARRIS
Assistant United States Attorney
Chief, Civil Division
JOANNE S. OSINOFF
Assistant United States Attorney
Chief, Complex and Defensive Litigation Section
CHRISTINA A. MARQUEZ (Cal. Bar No. 305301)
DAVID PINCHAS (Cal. Bar No. 130751)
Assistant United States Attorneys
Federal Building, Suite 7516
    300 North Los Angeles Street
    Los Angeles, California 90012
    Telephone: (213) 894-4061/2920
    Facsimile: (213) 894-7819
    E-mail: Christina.Marquez@usdoj.gov
    E-mail: David.Pinchas@usdoj.gov

Attorneys for Federal Defendant
United States of America

UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| Esvin Fernando Arredondo Rodriguez, individually and A.F.A.J., a minor, by her guardian ad litem, Jeffrey Hamilton,<br><br>Plaintiffs,<br><br>v.<br><br>United States of America,<br><br>Defendant. | No. 2:22-cv-02845-JLS-AFM<br><br>DEFENDANT'S OPPOSITION TO PLAINTIFFS' MOTION TO EXCLUDE TESTIMONY AND REPORT OF PSYCHOLOGICAL EXPERT DR. WILLIAMSON; DECLARATION OF CHRISTINA MARQUEZ; DECLARATION OF DAVID PINCHAS<br><br>Hearing Date:  March 29, 2024<br>Hearing Time:  10:30 a.m.<br>Ctrm:          8A<br><br>Honorable Josephine Staton<br>United States District Judge |

1

**TABLE OF CONTENTS**

I.    INTRODUCTION ..................................................................................... 1

II.   ARGUMENT ............................................................................................ 2

      A.   Defendant Complied With FRCP 26 and FRCP 35 ...................... 2

           1.   Dr. Williamson Was Timely Disclosed as a Rebuttal Expert
                and So Were His Psychological Examination Findings .................... 2

           2.   Even if the Court Finds Dr. Williamson's Disclosures Were
                Untimely That Disclosure Date Was Substantially Justified and
                Harmless .......................................................................................... 3

      B.   Dr. Williamson's Opinion Is Reliable and Admissible Under *Daubert* ....... 6

           1.   Dr. Williamson Did Not Rely Exclusively on AI-Generated
                Narratives or Self-Report Measures ............................................... 6

                a.   Computer Based Test Interpretation .................................. 7

                b.   The MMPI-2 ........................................................................ 8

                c.   T-Scores .............................................................................. 10

           2.   Dr. Williamson Relied on More Facts and Data Than
                Plaintiff's Expert Dr. Samuelson .................................................... 10

           3.   Dr. Williamson's Opinions Are the Product Of Reliable
                Principles and Methods .................................................................. 12

           4.   Dr. Williamson Reliably Applied a Comprehensive
                Methodology That Is the Recommended Standard in Forensic
                Assessment ..................................................................................... 12

      C.   Dr. Williamson is a Qualified Expert Wit___ensive Education,
           Experience, and Training in Trauma and ███ ................................ 13

           1.   Dr. Williamson's Expert Qualifica___ in Clinical Psychology
                and Experience with Trauma and ███ ....................................... 14

           2.   Dr. Williamson's Frequent Court Testimony As An Expert
                And Treating Clinical Psychologist ................................................ 17

           3.   Dr. Williamson's Awards and Recognition .................................. 18

III.  CONCLUSION ........................................................................................ 19

# TABLE OF AUTHORITIES

<u>Cases</u>

*A.A. v. Raymond*,
2013 WL 3816565 (E.D. Cal. July 22, 2013) .................................................... *passim*

*Alfen v. Toyota Motor Sales, U.S.A., Inc.*,
2012 WL 12930737 (C.D. Cal. Nov. 9, 2012) ........................................................ 4-5

*Amorgianos v. National R.R. Passenger Corp.*,
303 F.3d 256 (2nd Cir. 2002) ............................................................................... 11-12

*Att'y Gen. of Okla. V. Tyson Foods, Inc.*,
565 F.3d 769 (10th Cir. 2009) ..................................................................................... 6

*Avila v. Willits Envtl. Remediation Trust*,
633 F.3d 828 (9th Cir. 2011) ..................................................................................... 15

*Benton v. Ford Motor Co.*,
492 F. Supp. 2d 874 (S.D. Ohio 2007) ...................................................................... 20

*Bocanegra v. Vicmar Services, Inc.*,
320 F.3d 581 (5th Cir. 2003) ..................................................................................... 12

*Cleveland v. Behemoth*,
2022 WL 5314770 (S.D.Cal.Oct.6, 2022) ................................................................. 13

*Confederated Tribes of Siletz Indians of Or. v. Weyerhaeuser Co.*,
2003 WL 23715981 (D. Or. Jan. 21, 2003) ................................................................. 5

*Ellis v. Costco Wholesale Corp.*,
657 F.3d 970 (9th Cir. 2011) ............................................................................... *passim*

*In re Paoli R.R. Yard PCB Litigation*,
35 F.3d 717 (3d Cir. 1994) ........................................................................................... 5

*Int'l Med. Devices, Inc. v. Cornell*,
2022 WL 2784806 (C.D. Cal. June 16, 2022) ............................................................. 4

*Lanard Toys Ltd. v. Novelty, Inc.*,
375 F. App'x 705 (9th Cir. 2010) ................................................................................. 4

*Luttrell v. Novartis Pharm. Corp.*,
894 F. Supp. 2d 1324 (E.D. Wash. 2012) .................................................................. 20

*Mailhoit v. Home Depot U.S.A., Inc.*,
2013 WL 12122580 at *6 (C.D. Cal. Jan.24, 2013) .................................................... 2

ii

*McLean v. 988011 Ontario, Ltd.*,
    224 F.3d 797 (6th Cir. 2000) ......................................................................... 11

*Metavante Corp v. Emigrant Sav. Bank*,
    619 F.3d 748 (7th Cir. 2010) ........................................................................... 6

*Prod. Liab. Litig.*,
    424 F. Supp. 3d 781 (N.D. Cal. 2020) ............................................................ 6

*United States v. Garcia*,
    7 F.3d 885–90 (9th Cir.1993) ........................................................................ 15

*United States v. Smith*,
    520 F.3d 1097 (9th Cir. 2008) ...................................................................... 15

<u>Rules</u>

Federal Rule of Evidence 702 ........................................................................... 14

FRCP 26 ............................................................................................................... 2

FRCP 35 ............................................................................................................... 2

Rule 26 ............................................................................................................. 4, 5

Rule 35 ............................................................................................................... 2

Rule 37(b) ........................................................................................................... 5

Rule 702 ........................................................................................................... 20

## MEMORANDUM OF POINTS AND AUTHORITIES

## I.   INTRODUCTION

The Court should deny Plaintiffs' *Daubert* motion as to Dr. Williamson because the motion is based on mischaracterized evidence, on Plaintiffs' incorrect assumption that Dr. Williamson relied exclusively on AI-generated narratives and self-report measures, and on a self-serving declaration from Ms. Linda Dakin-Grimm—an attorney, who is **not** an expert psychologist. Ms. Dakin-Grimm's unfounded "because I so conclude" assertions regarding Dr. Williamson's qualifications and employed methodologies are insufficient to warrant exclusion of an expert with over 25 years of experience in clinical psychology and extensive experience with trauma and ███ .

Contrary to Plaintiffs' incorrect representations, Dr. Williamson relied on multiple sources of available information, including detailed multiple-hour interviews that he took of the Plaintiffs, record review, and rigorous testing. Dr. Williamson did not rely on AI-generated narratives, nor did he testify that he did. Dr. Williamson administered three different psychological tests on A.F.A.J., and he administered five different psychological tests on Mr. Arredondo. Dr. Williamson had an adequate foundation to formulate his opinions, and he reliably applied a comprehensive method, which is the recommended standard in forensic assessment.

Plaintiffs' complaints about disclosure are similarly defective as a basis for a *Daubert* motion. Dr. Williamson's opinions and psychological examination findings were timely disclosed on January 19, 2024 (the rebuttal disclosure deadline), one month before the expert discovery cut-off, several weeks before expert depositions, and seven months before the pre-trial conference. Plaintiffs have manufactured their own asserted prejudice by creating avoidable discovery disputes and by failing to supplement their initial expert reports—despite having a month to do so.

Accordingly, Defendant respectfully requests this Court deny Plaintiffs' *Daubert* Motion as to Dr. Williamson.

## II.   ARGUMENT

### A.   Defendant Complied With FRCP 26 and FRCP 35

1. <u>Dr. Williamson Was Timely Disclosed as a Rebuttal Expert and So Were His Psychological Examination Findings</u>

Dr. Williamson timely disclosed both his rebuttal report and his findings from Plaintiffs' medical examinations, which took place on December 20-21, 2023. *See* Plaintiffs' Exs. C and D (Dkts. 151-3, 151-4). Plaintiffs evidently contend that because Dr. Williamson performed a Rule 35 medical examination, he needed to disclose that as an initial expert disclosures. *See generally* Williamson Daubert Mot. (Dkt. 157-1) at pgs. 4-5. Rule 35 examinations are not limited to affirmative experts, however. "Courts have often authorized Rule 35 mental examinations to provide rebuttal experts with evidence to counter plaintiff's expert reports." *See Mailhoit v. Home Depot U.S.A., Inc*., 2013 WL 12122580 at *6 (C.D. Cal. Jan.24, 2013)(citing collection of cases supporting this proposition). "Rule 35 reports are not required to be produced by the moving party **unless requested** by the opposing party or the person examined." *Id*. at *4. The "report must 'set out in detail the examiner's findings, including diagnoses, conclusions, the results of any tests.'" *Id*.

Here, Dr. Williamson conducted his psychological examinations of Plaintiffs on December 20-21, 2023.[1] Dr. Williamson had proposed earlier dates in November 2023, but the Plaintiffs were unavailable—and the Defendant sought to accommodate the Plaintiffs' availability by scheduling them at the end of December, which the Plaintiffs

---

[1] At 9:56 a.m., four minutes before A.F.A.J's medical examination was scheduled to start, A.F.A.J. was refusing the medical examination unless her guardian ad litem, Jeffrey Hamilton, and her interpreter and family friend, Bertha Cardenti could be present. Williamson Decl. ¶ 35; *see also* Marquez Decl. ¶ 8. Plaintiffs were served with the Notices of Examination on December 7, 2023, which specifically prohibited third party observers. Plaintiffs never objected to these parameters. Marquez Decl. at ¶ 7. Dr. Williamson was concerned that if Ms. Cardenti was going to be translating the entire exam that the stipulated time frame of 7 hours may not be enough. Williamson Decl. ¶ 35. Had Defendant been aware of this, the parties could have discussed these issues prior to the day of the medical examination and resolved these issues.

1  agreed to. Declaration of Dr. Williamson ("Williamson Decl.") ¶¶ 43-44; *see also*

2  Declaration of Christina Marquez ("Marquez Decl.") ¶¶ 5-6. Notably, Plaintiffs never—

3  until the night they filed their *Daubert* motion—contended that these examinations

4  would be too late relative to the discovery cutoff, or that Dr. Williamson needed to

5  provide their reports the next day. As a rebuttal expert, Dr. Williamson was not required

6  to produce his Rule 35 findings regarding Plaintiffs' medical examinations by the initial

7  disclosure deadline of December 22, 2023, nor could he have done so, considering the

8  medical examinations of the Plaintiffs were conducted (by the parties' agreement no

9  less) ***one day before*** the initial expert disclosure deadline. Williamson Decl. ¶ 45.

10       Dr. Williamson produced his psychological examination findings together with his

11  rebuttal opinion within the expert discovery period. The expert discovery cut off was

12  February 16, 2024, approximately a month after Dr. Williamson's expert reports were

13  produced. Plaintiffs thus had ample time to take expert discovery on the subject. Dr.

14  Williamson disclosed his findings from the medical examinations, despite Plaintiffs not

15  requesting these findings until February 12, 2024 at his deposition. *See* Pltf's Ex.A (Dkt.

16  158-1) at 28:2-4. Finally, Plaintiffs' disclosure timing complaint is not a *Daubert* issue

17  in any event.

18       In sum, Dr. Williamson timely produced this material, Plaintiffs did not timely

19  object, and the Plaintiffs' belated attempts to exclude their own psychological

20  examination results are defective at every level.

21            2.   <u>Even if the Court Finds Dr. Williamson's Disclosures Were Untimely</u>

22                 <u>The Disclosure Date Was Substantially Justified and Harmless</u>

23       Further, Plaintiffs contend they have been prejudiced by the fact that Dr.

24  Williamson was not disclosed as an affirmative expert. However, Dr. Williamson being

25  disclosed as a rebuttal expert was both appropriate and harmless. "Among the factors

26  that may properly guide a district court in determining whether a violation of a discovery

27  deadline is justified or harmless are: (1) prejudice or surprise to the party against whom

28  the evidence is offered; (2) the ability of that party to cure the prejudice; (3) the

1   likelihood of disruption of the trial; and (4) bad faith or willfulness involved in not

2   timely disclosing the evidence." *Lanard Toys Ltd. v. Novelty, Inc.*, 375 F. App'x 705, 713

3   (9th Cir. 2010) (*citing David v. Caterpillar*, Inc., 324 F.3d 851, 857 (7th Cir. 2003)).

4   Even where a report did not comply with the requirements of Rule 26, its inclusion was

5   "substantially justified and harmless" where it was served before the expert discovery

6   cutoff, the expert's deposition, and nearly six months before the final pretrial conference.

7   *See Int'l Med. Devices, Inc. v. Cornell*, 2022 WL 2784806, at *3 (C.D. Cal. June 16,

8   2022).

9        Here, Dr. Williamson's opinions and psychological examination findings were

10  disclosed almost a month prior to the expert discovery cut-off, several weeks prior to any

11  expert deposition, and seven months before the pre-trial conference. Plaintiffs' expert

12  Dr. Samuelson was not foreclosed from preparing a supplemental report responding to

13  Dr. Williamson's opinions or psychological examination findings. Courts in the Central

14  District of California (and elsewhere in the 9th Circuit) have regularly allowed experts to

15  submit supplemental reports to address arguments raised for the first time in a rebuttal

16  expert report. *See Int'l Med. Devices, Inc.*, 2022 WL 2784806, at *3 (citing *Medtronic,

17  Inc. v. Edward Lifesciences Corp.*, 2013 WL 12131746, at *5 (C.D. Cal. July 24, 2013)

18  (declining to strike portions of a supplemental expert report that simply "rebut the new

19  non-infringement theories" that were raised for the first time on rebuttal)); *see also Alfen

20  v. Toyota Motor Sales, U.S.A., Inc.*, 2012 WL 12930737, at *3 (C.D. Cal. Nov. 9, 2012)

21  ("[T]he sur-rebuttal reports address issues raised by Toyota's rebuttal expert reports ....

22  Thus, the reports are proper subjects for rebuttal expert testimony."); *Confederated

23  Tribes of Siletz Indians of Or. v. Weyerhaeuser Co.*, 2003 WL 23715981, at *2 (D. Or.

24  Jan. 21, 2003) ("The supplemental expert testimony was generated in direct response to

25  Defendant's attack upon the original expert reports.").

26       Additionally, Plaintiffs' counsel could have elicited Dr. Samuelson's rebuttal

27  opinions at her deposition. Plaintiffs cannot manufacture prejudice by their own failure

28  to cure any prejudice when they had sufficient opportunity to do so. *See In re Paoli R.R.*

4

*Yard PCB Litigation*, 35 F.3d 717 (3d Cir. 1994) (finding abuse of discretion where the district court excluded an expert witness as a Rule 37(b) sanction where prejudice could have been easily cured since the plaintiffs' expert missed the deadline by only a month, 4 months remained before trial, so there was enough time to depose the expert without disrupting the trial date). Here, Plaintiffs have affirmatively sought to avoid curing their claimed prejudice. At the meet and confer conference on March 4, 2024 (which addressed the Plaintiffs' failure to meet and confer prior to filing their *Daubert* motions), Defendant informed Plaintiffs that Plaintiffs' psychological expert, Dr. Samuelson, could prepare a supplemental report if they wanted, with the Court's approval of course. *See* Marquez Decl. at Ex. 5. But Plaintiffs declined to resolve their claims of prejudice that way, citing alleged budgetary constraints on their law firm, Milbank LLP, which they contended was not able to afford such a supplemental report. *See id*.

Plaintiffs also contend that they were prejudiced because they did not receive the underlying data that Dr. Williamson relied on. Williamson Daubert Mot. 9-10. Again, this is another example of Plaintiffs fabricating their own claimed prejudice and mischaracterizing the facts.[2] The entirety of Dr. Williamson's expert file was produced by January 30, 2024, almost two weeks prior to his deposition, apart from the redacted test questions, which were the subject of Defendant's *Ex Parte* Application (Dkt.141). *See* Marquez Decl. at Ex.2. Plaintiffs could have received these test questions at the same time as Dr. Williamson's other materials, or obtained the testing materials from Dr. Samuelson, but they refused to compromise. Even Dr. Samuelson acknowledged the ethical concerns with producing the copyrighted testing materials. *See* Pinchas Decl. at

---

[2] Plaintiffs contend that Dr. Williamson's report failed to comply with Rule 26 because he did not produce the materials underlying his opinions and did not include in his list of testimony the instances where he testified in immigration court. Williamson Daubert Mot. at pgs. 9-10. This argument hypocritical, considering Defendants repeatedly had to ask for Dr. Samuelson's entire expert file and did not receive the entirety of the file from the Plaintiffs until two days prior to her deposition. Marquez Decl. at ¶¶ 18-20, Ex.4. Further, Dr. Samuelson's report failed to include her CV and the list of prior testimony, which is required under Rule 26. Marquez Decl. at ¶ 9. In sum, if Dr. Williamson were excluded on this basis, then *a fortiori* Plaintiffs' expert Dr. Samuelson would also need to be excluded, because Plaintiffs were much less timely in disclosing Dr. Samuelson's file.

Ex. 2 (Samuelson Depo at 29-31). Rather, Plaintiffs took an unreasonable position, attempting to bully the Defendants' expert into disregarding his ethical obligations. And in any event, they were able to depose Dr. Williamson on this subject. Accordingly, this Plaintiffs' motion lacks any merit on this ground.

**B.    Dr. Williamson's Opinion Is Reliable and Admissible Under *Daubert***

The Ninth Circuit has placed great emphasis on Daubert's admonition that a district court should conduct the analysis "with a 'liberal thrust' favoring admission." *In re Viagra (Sildenafil Citrate) & Cialis (Tadalafil) Prod. Liab. Litig.*, 424 F. Supp. 3d 781, 790 (N.D. Cal. 2020)(*citing Messick v. Novartis Pharmaceuticals Corp.*, 747 F.3d 1193, 1196 (*quoting Daubert*, 509 U.S. at 588)). Additionally, the usual concerns of the rule—keeping unreliable expert testimony from the jury—are not present in a bench trial, and this factor must be taken into account when determining admissibility. *See Metavante Corp v. Emigrant Sav. Bank*, 619 F.3d 748, 760 (7th Cir. 2010); *see also Att'y Gen. of Okla. V. Tyson Foods, Inc.*, 565 F.3d 769, 779 (10th Cir. 2009)("the usual concerns regarding unreliable expert testimony reaching a jury obviously do not arise…[in] a bench trial…[t]hus the 'scope of [the court's] review is quite narrow.'").

"A trial court has broad latitude not only in determining whether an expert's testimony is reliable, but also in deciding how to determine the testimony's reliability." *Ellis v. Costco Wholesale Corp.*, 657 F.3d 970, 982 (9th Cir. 2011) (*citing Kumho*, 526 U.S. at 152).

**1.    Dr. Williamson Did Not Rely Exclusively on AI-Generated Narratives or Self-Report Measures**

Dr. Williamson prepared two expert reports in this case for both Plaintiffs. In doing so, he relied on multiple sources of information, and followed well-established professional guidelines. *See* Williamson Decl. at ¶ 24. In addition to conducting detailed in-person interviews and record reviews, Dr. Williamson administered psychological tests to both Plaintiffs. *Id*. at ¶ 25. Dr. Williamson administered both simple self-report tests, which do not have validity indicators, and other psychological tests, that have

6

embedded validity indicators.[3] *Id*. at ¶¶ 25-27.

More specifically, for Mr. Arredondo, Dr. Williamson administered the Minnesota Multiphasic Inventory-2 (MMPI-2) and the Trauma Symptom Inventory-2 (TSI-2), which have embedded validity indicators. *Id*. at ¶ 26. In addition, to the MMPI-2 and TSI-2, Dr. Williamson also administered three other checklist tests to Mr. Arredondo: the Beck Anxiety Inventory (BAI), the Beck Depression Inventory, second edition (BDI-2), and the Beck Hopelessness Scale (BHS). *Id*. at ¶ 27. These are self-report tests that do not have validity indicators, and therefore, are best used in conjunction with other available tests and other sources such as a clinical interview and records. *Id*. at ¶ 27.

As for A.F.A.J., all the tests Dr. Williamson administered contained validity indicators, which included the Minnesota Multiphasic Personality Inventory, Adolescent version (MMPI-A), the Millon Adolescent Clinical Inventory (MACI), and the TSI-2. The TSI-2 was administered to both Plaintiffs.[4] *Id*. at ¶ 26.

### a.    Computer Based Test Interpretation

In imagining "AI" issues, Plaintiffs mischaracterize Dr. Williamson's deposition testimony. Dr. Williamson never admitted to using "AI-generated narratives" and he did not refer to any of his expert reports as "AI." *See* Williamson Decl. at ¶ 30; *see also* Pltfs' Ex.A (Dkt.158-1) at 150. Dr. Williamson relied, ***in part***, on Computer Based Test Interpretation (CBTI). *See* Williamson Decl. at ¶ 30. Contrary to Plaintiffs' contention that Dr. Williamson testified that "wide swaths of his report are AI-generated," only three and a half pages of CBTI interpretation make up A.F.A.J.'s report and only three

---

[3] While psychological tests that measure personality and emotions generally involve self-report measures, there are also psychological tests with embedded validity indicators. *See* Williamson Decl. at ¶ 25. Validity indicators in this context refer to specific scales and subscales within psychological tests that measure issues such as the test-taker's ability to understand the test questions, overreporting, underreporting, malingering, and other issues. *Id*.

[4] Plaintiffs' Ex. T at pg. 221 (Dkt. 151-20) indicates that "psychological research and legal review suggest that the TSI/TSI-2 is admissible as an instrument under the *Daubert* Standard. Later in the article, it states "*the literature ██ the past 25 years has generally demonstrated the utility of TSI/TSI-2 in identifying ██ symptomatology in clinical settings and the general acceptance of the instrument ██ use in those settings*. *See id*. at pg. 224 (emphasis added).

fourths of one page of Mr. Arredondo's report was a computer-generated validity report. *Id*. at 31. CBTI—as opposed to AI—is based on a particular norm group that has been evaluated by experts. *Id*. at 30. From those norm groups, hypotheses are generated. *Id*.

Dr. Williamson emphasized repeatedly in his deposition that he only considered the CBTIs as one data point in his overall workup. *See* Pinchas Decl. at Ex. 1 (Williamson Depo) at 153-155 (Emphasis added).

Plaintiffs' counsel have completely disregarded Dr. Williamson's actual testimony and reports on this point. In imagining and then mechanically repeating their incorrect arguments about a menacing AI threat, Plaintiffs' counsel have not identified any legitimate basis for precluding Dr. Williams' testimony.

> #### b.    The MMPI-2

Additionally, Dr. Williamson did not rely on an outmoded version of the MMPI, nor did he admit that the MMPI-2 was outdated. The MMPI-2 is widely considered to be an outstanding personality inventory, and it may be the most researched personality test in the history of psychology. *See* Williamson Decl. ¶ 38. There are literally decades of research that support its utility in many domains. *Id*. It contains 567 questions and is substantially longer than its progeny, the Personality Assessment Inventory, the MMPI-2, Revised Format (RF), and the MMPI-3, all of which have 200+ fewer items. *Id*. Attempts have been made to shorten the test to improve its efficiency (i.e. speed of application), but with unclear results. *Id*. In fact, Plaintiffs' Exhibit N (Dkt. 151-14) supports this. It states in pertinent part:

> "Although the MMPI-2-RF and MMPI-3 have been released, they are not included in the present case study due to differences in items between the MMPI-2 and the MMPI-2-RF and MMPI-3, limited research on the MMPI-3, an*d as the MMPI-2 remains the most widely administered empirically validated tests of personality and psychopathology in use today*."

*See* Dkt. 151-14 at pg. 200 (emphasis added).

Within the forensic and personality fields, there have been substantial disagreements about the comparative efficacy of later, shorter versions of the original MMPI/MMPI-2. *See* Williamson Decl. ¶ 39. Indeed, many critics have pointed out that

the MMPI-2 had similar methodology as the original MMPI, while the MMPI-2-Revised Format (MMPI-2-RF) and MMPI-3[5] made some substantial methodological changes, enough to make it a very different type of test. *Id*. The result is that some MMPI experts feel that using the same general name, the MMPI, for all the versions is very misleading. *Id*. They are, in fact, very different tests methodologically and the progeny are not simply sequels or improvements. *Id*. Accordingly, the MMPI-2- RF and MMPI-3 have been criticized. *Id*. For example, in Michael Parisien's article titled *Empirical vs. Factorial Validity in Personality Inventories: The MMPI-2 and the Restructured RC Scales*, 2021 it states in pertinent part:

> [T]he MMPI-2, the University of Minnesota Press Publishers and their publishers and their distributors Pearson Assessments recently released an "MMPI-3" (emerged from the MMPI-2-RF), which basically has nothing to do with MMPI/MMPI-2."
>
> ….
>
> "For the moment, the RC scales, resulting from a theoretical and factorial strategy are no match for the empirical psychometric strategy that made and still makes the MMPI/MMPI-2 instruments the nec plus ultra of personality inventories used in clinical and psycho-legal contexts."

*See* Williamson Decl. at Ex. 1.

There is debate in the field as to which tests are appropriate, without any consensus. For example, the Federal Aviation Administration (FAA), after a methodological analysis of its massive database of previous test administrations, has determined that Airline Pilots, FAA Air Traffic Control Specialists (ATCSs), Federal Air Marshals, and NASA astronauts and therefore the public, is better served by continuing to use the MMPI-2. The FAA statement noted:

> "When the MMPI-2-RF was released, there was consensus among MMPI experts that the MMPI-2-RF was a completely new test and not a revision of the MMPI/MMPI-2. Indeed, Ben-Porath (2017, p. 277) asserted that, "the MMPI-2-RF was introduced as an alternative to, rather than a replacement for the MMPI-2."
>
> …
>
> "In summary: The MMPI and MMPI-2 have accumulated seven decades of

---

[5] Dr. Samuelson used the MMPI-3.

9

validation with pilots and other aerospace personnel. Unlike the MMPI-2, the "MMPI-3" is simply a revision of the MMPI-2-RF. Valid pilot and ATCS norms are available for the MMPI-2 but not for the MMPI-2-RF or the "MMPI-3." For these reasons, the FAA will continue to require the use of the MMPI-2 for pilot and ATCS assessments. The MMPI-2-RF and "MMPI-3" are not acceptable substitutes for FAA assessments. This policy is in accordance with Guideline #8 of the Professional Practice Guidelines for Occupationally-Mandated Psychological Evaluations published by APA (2018, p. 193), which notes: "Psychologists seek to select and rely on assessment tools validated for use with a population appropriate to the evaluation."

*See* Williamson Decl. at Ex. 2; *see also* Pinchas Decl. at Ex. 1 (Williamson Depo) at 182-185. While there is no consensus in the field as to which test is appropriate, there is a reflex among less experienced clinicians to use the latest version of a test or accept what a new tests creator says about it, independent of the other sources of research on it or methodological changes. *See* Williamson Decl. at ¶ 41. Many professional psychological organizations endorsed a position statement in 2018 highlighting the importance of not simply selecting the newest version of a test or claiming earlier versions are no longer valid. *Id.* at Ex.3

### c.  T-Scores

Dr. Williamson does not simply recite the T-scores that were reported. Computer scored tests are used routinely in forensic assessments. *See* Williamson Decl. at ¶ 28. In this case both psychological experts used computer scored tests. *Id.* The tests were scored by different companies including Pearson Assessments (Five tests: BAI, BDI-2, BHS, MACI, MMPI-A), Psychological Assessment Resources, (One test: TSI-2), and the Caldwell Reports (One test: MMPI-2). *Id.* These scores were used to generate hypotheses to use in conjunction with other evidence, including other tests, records, and interviews. *Id.* at ¶ 29.

### 2.  Dr. Williamson Relied on More Facts and Data Than Plaintiff's Expert Dr. Samuelson

Dr. Williamson relied on sufficient facts and data in formulating his opinion. Regardless, however, weaknesses in the factual basis of an expert witness' opinion "bear on the weight of the evidence rather than on its admissibility." *McLean v. 988011*

*Ontario, Ltd*. 224 F.3d 797, 801 (6th Cir. 2000); *Amorgianos v. National R.R. Passenger Corp*. 303 F.3d 256, 267 (2nd Cir. 2002); *Bocanegra v. Vicmar Services, Inc*. 320 F.3d 581, 589 (5th Cir. 2003) (Court found that unknown quality and quantity of marijuana ingested by driver affected weight given to toxicologist's testimony regarding effect on cognitive functions, not admissibility").

Dr. Williamson formulated his opinions by assessing an overall body of knowledge, which included extensive psychological testing, in-person interviews of Plaintiffs, and a record review of various documents. *See* Williamson Decl. ¶¶ 24-33. Dr. Williamson conducted detailed clinical interviews with both plaintiffs, 3.25 hours for A.F.A.J. and 3.75 hours for Mr. Arredondo. *Id*. at ¶ 32. This was separate from, and in addition to, the face-to-face interview time. *Id.* at ¶ 36. Additionally, the interviews were conducted in Spanish, as Dr. Williamson is bilingual. *Id*.  In total, the medical examinations for Plaintiff were approximately six (A.F.A.J.) and seven hours (Mr. Arredondo). *Id*. Dr. Williamson prepared nine pages of handwritten note from each of those interviews. *Id*.

In contrast, the Plaintiffs' expert, Dr. Samuelson, conducted both Plaintiffs' interviews with an interpreter (which slows the interview). *Id*. at ¶ 33. According to her report, in the case of A.F.A.J., Dr. Samuelson's interview with A.F.A.J. lasted *just 90 minutes total, including translation*. *Id*. Further, Dr. Samuelson used Ms. Bertha Cardenti as an interpreter, who was not a certified interpreter, and represented herself to Dr. Williamson during A.F.A.J.'s medical examination as a volunteer and ***family friend***. *Id*. at ¶ 37. Dr. Samuelson admitted that she would have preferred a certified interpreter and admitted if Ms. Cardenti was a family friend there could be bias. *See Pinchas* Decl. at Ex. 2 (Samuelson Depo) at 44-45. In addition to detailed interviews and record review, Dr. Williamson administered several psychological tests to both Plaintiffs. *See supra* Section III.B.1.

In sum, by any such criteria, Dr. Williamson considered significantly more data and a more extensive examination than did Plaintiffs' retained expert. And in any event,

1   this is an issue going to the weight, rather than admissibility, of their testimony.

2          3.     Dr. Williamson's Opinions Are the Product Of Reliable Principles

3                 and Methods

4          As discussed above, Dr. Williamson's opinions are the product of a variety of

5   factors, including: (1) his review of medical documents, case background information,

6   and deposition testimony, (2) his clinical interviews with Plaintiffs, and (3) his

7   application of various clinical tests to the Plaintiffs. *See Cleveland v. Behemoth*, 2022

8   WL 5314770, at *3 (S.D.Cal.Oct.6, 2022)(denying *Daubert* motion finding that

9   psychiatrist used reliable principles and methods in his administration of the MMPI–2

10  and that his expert testimony was based on a variety of factors including: (1) his review

11  of medical documents, including medical records, employment records, and deposition

12  testimony, (2) a clinical interview with Plaintiff, and (3) various clinical tests, including

13  the MMPI–2).

14         Plaintiffs' attempt to argue that Dr. Williamson should be excluded relies on their

15  false assertion that Dr. Williamson relied exclusively on self-report measures and AI

16  generated narratives. Daubert Mot. at 18. As discussed *supra*, Plaintiffs are demonstrably

17  wrong.

18         4.     Dr. Williamson Reliably Applied a Comprehensive Methodology

19                That Is the Recommended Standard in Forensic Assessment

20         Dr. Williamson utilized the administered psychological tests to generate

21  hypotheses to use in conjunction with other evidence, including other tests, records, and

22  extensive direct interviews. *See* Williamson Decl. at ¶ 29. Dr. Williamson also did his

23  own assessment of the test results, apart from any actuarial narrative. *Id*. This

24  comprehensive method that Dr. Williamson used is the recommended standard in

25  forensic assessment. *Id*.

26         Plaintiffs misrepresent Dr. Williamson's testimony and allege that he just copied

27  and pasted the CBTIs in his reports. *See* Williamson Daubert Mot. at 21. This is

28  disingenuous considering Plaintiffs' counsel openly acknowledged at Dr. Williamson's

12

deposition that he did not cut and paste, much less do so with no indication of what he was doing:

> Q: A peer-reviewed article widely cited in which she and her co-authors state clinical users who cut and paste often with no indication that they are doing so, ***which is not what you did***…
>
> A: I agree that if you just post the report without clarifying that it is a computer-scored report then that would be one error.  Another error would be to take it as true.  ***For example, these three reports all have different diagnostic conclusions.  I'm clearly not relying in a verbatim way on them, I'm considering them as part of an overall workup, and I also do my own separate interpretation within the report and don't rely exclusively on a computer report… so I think you have to look at this carefully and I think sometimes as long as it is understood that these are computer-generated and not gospel I think that's an appropriate use to have as one data point and the expert can decide what weight to give it.***"

*See* Plaintiffs' Ex.A (Dkt.158-1)(Williamson Depo) at 155-157 (Emphasis added).

Rather, Dr. Williamson's testimony and how he used the CBTIs is consistent with the scholarly article Plaintiffs cite as Exhibit N (Dkt.151-14), which states in pertinent part:

> "Regardless of scoring program used, ***the generic narrative statements and diagnostic suggestions arising from CBTIs can still be utilized as hypotheses to be tested and supported with evidence beyond the results of a single psychological test***."

*See* Daubert Mot., Ex.N at 210 (emphasis added).

Lastly, Plaintiffs incorrectly contend that he used test scores as the sole indicators to characterize functioning, competence, attitude, and predisposition. Again, Plaintiffs' claim on this point is false. As discussed above, Dr. Williamson relied on several sources of information.

**C.    Dr. Williamson is a Qualified Expert With Extensive Education, Experience, and Training in Trauma and** ███

Dr. Williamson has testified in numerous cases, and the courts have consistently found him to be an expert who is qualified to testify on clinical psychology. No courts have excluded his testimony. The Plaintiffs in this litigation, however, make a perfunctory argument that he is unqualified to testify about clinical psychology, and in doing so they misstate both the relevant facts and law. Federal Rule of Evidence 702 requires the expert to testify on matters "within the reasonable confines of his subject

1  area." *Avila v. Willits Envtl. Remediation Trust*, 633 F.3d 828, 839 (9th Cir. 2011)

2  (quotation marks and citation omitted). The person proffering the witness "bear[s] the

3  burden of showing that [the expert] possesses some 'knowledge, skill, experience,

4  training, or education' that qualifies him to give such opinions." *A.A. v. Raymond*, 2013

5  WL 3816565, at *6 (E.D. Cal. July 22, 2013) (*quoting Thomas v. Newton Int'l Enters.*,

6  42 F.3d 1266, 1269 (9th Cir.1994)).

7      1.    Dr. Williamson's Expert Qualifications in Clinical Psychology and

8              Experience with Trauma and ▮▮▮

9      Dr. Williamson *is a clinical psychologist* with extensive experience in trauma and

10  ▮▮▮, and regularly treats individuals with trauma. Williamson Decl. ¶¶ 1, 12. Plaintiffs

11  contend that Dr. Williamson must be board certified by the American Board of

12  Professional Psychology to be a clinical psychologist. *See* Williamson Daubert Mot. at

13  13, fn. 6. To support this contention, Plaintiffs rely exclusively on the declaration of Ms.

14  Dakin-Grimm—who is a party-affiliated attorney, *not* an expert psychologist, and who

15  has no relevant ability to opine on this subject. *See* Dakin-Grimm Decl. ¶ 19. Contrary to

16  Plaintiffs' counsel, the American Psychological Association (APA) does not require nor

17  endorse any private board certifications. Williamson Dec. at ¶ 2. This is consistent with

18  Plaintiff's expert Dr. Samuelson's testimony, wherein she stated, "in psychology, unlike

19  medicine, you don't have to be board certified to call yourself a sub-specialty." *See*

20  Pinchas Decl. at Ex. 2 (Samuelson Depo) at 24:22-25.

21      Dr. Williamson is licensed by the California Board of Psychology,[6] has been

22  licensed to practice independently as a psychologist in California[7] for over 25 years, and

23  has worked exclusively during that period as a clinical psychologist. Williamson Decl. at

24

25      [6] Dr. Williamson has never described himself as being certified by any other
    board, other that the California Board of Psychology. Williamson Decl. at ¶ 2. There are
26  many independent, private boards in the field of psychology. *Id*. For example, the
    American Board of Professional Psychology (ABPP), the American Board of
27  Assessment Psychology (ABAP) and the National Academy of Neuropsychology
    (NAN). *Id*.
28      [7] Dr. Williamson is also licensed as a psychologist in the state of Hawaii and was
    temporarily licensed in the State of Ohio. Williamson Decl. at ¶ 1.

¶¶ 1,3. Since April 2012, he has been licensed as a Qualified Medical Examiner in California specializing in Clinical Psychology, and a fully credentialed member of the National Register of Health Service Providers in Psychology, which has higher credentialing requirements that allow providers to work across state lines. *Id*. at ¶ 1. For the past fifteen years, Dr. Williamson has served, and continues to serve as a Clinical Psychological Examiner for the United States Department of Defense Medical Review Board, assessing different issues such as ███████████████████ (████. *Id*. at ¶ 11.

Although Dr. Williamson completed his master's degree and doctorate in educational psychology, specializing in counseling, the core of the education and clinical psychology programs were nearly identical. *Id*. at ¶ 4. The academic coursework overlapped substantially with clinical psychology, and graduates from both programs qualify for the same professional licensure: a licensed psychologist in California. *Id*. at ¶ 4. Dr. Williamson pursued a career in clinical psychology by pursuing training and internships related to clinical psychology. *Id*. at ¶ 5. In that regard, Dr. Williamson completed approximately 5,000[8] pre- and post-doctoral training hours in *clinical* psychology, including the subspecialty of neuropsychology. *Id*. at ¶ 6. Dr. Williamson deliberately sought extensive training in different areas of clinical psychology prior to his licensure. *Id*. Many of these hours were in medical settings and mental health agencies. *Id*.

Other examples of the clinical training and experience Dr. Williamson received prior to his licensure, and related to trauma and ████, include the following:

1. Training and supervising clinical work in a homeless shelter, where he worked with homeless populations who had histories of trauma both before and while living on the streets. *Id*. at ¶¶ 7, 13. Much of the training and supervision Dr. Williamson received there was specifically directed

---

[8] The California Board of Psychology only requires 3,000 hours in clinical work to sit for the psychologist license exam. *Id*. at ¶ 6.

towards evaluating and treating trauma, including ███. *Id*. at ¶ 13.

2. Dr. Williamson also received training and conducted therapy under the auspices of the Los Angeles County Department of Mental Health in response to the 1991 Los Angeles riots where his team was tasked with providing direct clinical services to individuals who suffered traumatic stress from the riots. *Id*. at ¶¶ 7, 15. Dr. Williamson was supervised by a clinical psychologist and given training on how to work with traumatized individuals, emphasizing the issues in the Latino community. *Id*. at ¶ 15.

3. Dr. Williamson also worked in UCLA's neuropsychiatric institute now renamed the Semel Institute for Neuroscience and Human behavior. *Id*. at ¶ 7.

4. Additionally, Dr. Williamson received approximately 2,000 hours of supervision and training by a clinical neuropsychologist, who frequently served as a forensic expert. *Id*. at ¶ 16. In this position, Dr. Williamson worked mostly with cases of traumatic brain injuries (TBI). *Id*. Many of those cases also involved substantial orthopedic injuries because of violent injuries and had comorbid diagnoses of ███. *Id*. In general, the cases involved quite severe trauma in adults and minors. *Id*. Since then, Dr. Williamson has continued to work with TBI patients, including for example, directing two therapy groups for TBI patients, one in English and one in Spanish, within the last twelve months. *Id*.

5. Dr. Williamson also worked at Advanced Psychological Services which was funded through the California Victims of Crime Program. *Id*. at ¶ 14. The clinical director was a highly experienced clinical psychologist who held trainings on treatment of trauma ███ in children and adults. *Id*. Dr. Williamson went to external trainings related to treating victims of crime. *Id*. The focus of the work was on violent assaults, physical and sexual abuse, and grief, mostly with children, but also included adult victims. *Id*.

16

As a result of the foregoing experience, Dr. Williamson became a Clinical Psychologist, which is the work he has done for his entire professional career.[9] By contrast, he is not a Licensed Educational Psychologist.

Following his licensure, Dr. Williamson served as the Director of Clinical Supervision for three years, at Allcare Mission Health Center ("Allcare") where he provided direct clinical services and conducted in service trainings and supervision to the interns and psychological associates about treatment of trauma and ███. *Id.* at ¶ 10.

In 2018, Dr. Williamson used his experience with trauma to do volunteer work with the American Red Cross in mental health disaster relief. *Id.* at ¶ 18. Dr. Williamson underwent a series of their training protocols. *Id.*

Based on Dr. Williamson's extensive experience, he was asked in 2021 to present on a panel of experts regarding evaluation and treatment of individuals following TBIs. *Id.* at ¶ 19. The presentation was titled, *Medicine for the Brain: Depression, Anxiety, and ███ - Symptoms, Effects, and Treatment for Traumatic Brain Injury*, (TBI) to the Consumer Attorneys Association of Los Angeles (CAALA). *Id.* There were four experts on the panel including Dr. Williamson, a pediatric neurologist, a clinical neuropsychologist, and a neuroradiologist. *Id.* They shared information about multidisciplinary diagnoses and treatment of TBI including ███, depression, neuropsychological insult, and neurological injuries. *Id.*

> 2.   Dr. Williamson's Frequent Court Testimony As An Expert And Treating Clinical Psychologist

Dr. Williamson has testified both as an expert and treating clinical psychologist frequently in his career. *Id.* at ¶ 20. He has testified well over 100 times, including

---

[9] The licensing for Licensed Educational Psychologists is overseen by a separate board (Board of Behavioral Sciences). *Id.* at ¶ 9. Licensed Educational Psychologists are also subject to a different set of license requirements. See https://www.bbs.ca.gov/applicants/lep.html. *Id.* The California Board of Psychology regulates and licenses psychologists, including clinical psychologists, in California. See https://www.psychology.ca.gov/. *Id.*

17

Federal Court at least eight times and in multiple jurisdictions in different states. *Id*. More specifically, he has been qualified to testify as an expert on trauma and ███ on many occasions and has never been considered unqualified by any court or judge. *Id*.

For example, in one federal case from 2020, discussed in Dr. Williamson's deposition, he testified as an expert clinical psychologist about a man who became quadriplegic in a horrific accident. *Id*. at ¶ 21. In another federal case, Dr. Williamson offered testimony about two minors, brother and sister, whose father's died while interacting with law enforcement. *Id*. Their father's death was on a video that the children saw and could access in the public domain. *Id*. In 2021, Dr. Williamson testified in federal court in Riverside, California, where two parents witnessed their adult son, who had special needs, killed by gunshot in their presence; they were both also shot and seriously injured. *Id*. More recently, in October 2023, Dr. Williamson testified in a highly publicized case regarding long term sexual abuse against the Moreno Valley School District. *Id*.

### 3.    Dr. Williamson's Awards and Recognition

Dr. Williamson received a special recognition from the California Psychological Association (CPA) for volunteering time in the community following the terrorist attacks of 9/11. *Id*. at ¶ 22. He was invited by and volunteered guidance on Spanish language media outlets to advise parents to speak with (and listen to) their children about psychological reactions to the attacks. *Id*.

In April 2023, Dr. Williamson received a five-year award of volunteer excellence from the American Red Cross for providing disaster relief for mental health services. *Id*. at ¶ 23.

Despite Plaintiffs' false claims that Dr. Williamson has zero training in trauma or the treatment of traumatized children, the foregoing demonstrate otherwise. Lastly, Dr. Williamson's lack of publications or memberships in certain organizations does not render him unqualified. *See Luttrell v. Novartis Pharm. Corp*., 894 F. Supp. 2d 1324, 1336 (E.D. Wash. 2012) (stating that "Rule 702 does not require an expert to publish

18

articles ... in order to qualify to give expert testimony"); *Benton v. Ford Motor Co.*, 492 F. Supp. 2d 874, 876 (S.D. Ohio 2007) (reasoning that "although things like extensive academic pedigree and prolific scholarly publication by a proffered expert are persuasive indicators of qualification, the presence or absence of such qualifications almost always bears on the weight that the jury should assign to the testimony and not on the admissibility of the testimony itself.").

## III.   CONCLUSION

Defendant respectfully requests that this Court deny Plaintiffs' *Daubert* motion as to Dr. Williamson. Dr. Williamson has clearly established that he is qualified and employed reliable principles in formulating his opinions. Further, Dr. Williamson's report and psychological examination findings were timely disclosed, and may not properly be excluded under *Daubert*.

Dated: March 12, 2024                Respectfully submitted,

E. MARTIN ESTRADA
United States Attorney
DAVID M. HARRIS
Assistant United States Attorney
Chief, Civil Division
JOANNE S. OSINOFF
Assistant United States Attorney
Chief, Complex and Defensive Litigation Section


     /s/ *Christina Marquez*
CHRISTINA MARQUEZ
DAVID PINCHAS
Assistant United States Attorney

Attorneys for United States of America

Certification of Compliance with Local Rule 11-6.2

The undesigned counsel of record for Defendant certifies that this brief contains 6,927 words, which complies with the word limit of Local Rule 11.6.1

_/s/ Christina Marquez_
CHRISTINA MARQUEZ